UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

GERSON PELAGIO SUAREZ,

Defendant.

No. 16-cr-453 (RJS)
ORDER

RICHARD J. SULLIVAN, Circuit Judge:

The Court is in receipt of a *pro se* motion from Defendant Gerson Pelagio Suarez, dated August 30, 2020, requesting compassionate release under the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A). While the Court has publicly docketed that motion and several of its attachments (attached hereto), Defendant also provided the Court with several pages of medical records relevant to his requested relief. The Court has reviewed this private medical information and concluded that the presumption in favor of open records is outweighed by Defendant's privacy interest. *See United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995). Accordingly, the medical records attached to Defendant's motion for compassionate release shall be filed under seal. Separately, the government is ordered to file a letter by September 22, 2020, setting forth its position on Defendant's request.

SO ORDERED.

Dated: September 14, 2020
New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
Plaintiff,

v.

Gerson Pelagio Suarez,
Defendant.
_______________________/

Case / Docket #:
16-CR-453-2

Honorable Judge:
**Richard Sullivan**

**MOTION FOR REDUCTION IN SENTENCE**
For Extraordinary and Compelling Reasons
Pursuant to 18 U.S.C. § 3582(c)(1)(A)

COMES NOW, Gerson Pelagio Suarez, Petitioner Pro Se, to respectfully request that the Court order his immediate release from the custody of the Bureau of Prisons (BOP) because extraordinary and compelling reasons exist that warrant a reduction in sentence to Time Served, and that he be transferred to his home country of Curacao / Netherlands Antilles, where he will serve a period on home confinement, pursuant to Section 603 of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)).

Under the First Step Act of 2018, Federal prisoners may now petition courts directly for reduction of their sentences, and judges may grant such requests if "extraordinary and compelling reasons" warrant reduction. (See: First Step Act of 2018, Section 603(b)). Previously, courts could modify sentences under § 3582(c)(1)(A) only upon motion of the BOP. Since the First Step Act was enacted, courts have granted relief under §

3582(c)(1)(A) in numerous cases, including at Mr. Suarez's own prison, FCI Fort Dix. Here, the Court has the authority to modify Mr. Suarez's sentence because "extraordinary and compelling" circumstances are present.

Mr. Suarez has been in need of medical help for more than four (4) years. The BOP, however, has been indifferent to Mr. Suarez's needs since his incarceration in 2016. Furthermore, Mr. Suarez's pre-existing conditions of Hypertension, High Cholesterol, Osteoarthritis, Obesity (BMI 30), and 21 year history of Cigarette Smoking, that in combination with the novel Coronavirus 2019 (COVID-19) pandemic, place him at grave risk of serious illness and death.

Mr. Suarez has shown a continued commitment to rehabilitation and is not a danger to his community. He has now been incarcerated for 51 months, which is sufficient to meet the goals of sentencing.

As a pro se petitioner, Gerson Pelagio Suarez, (hereinafter "Petitioner") asks that the Court construe this motion with liberal construction in accordance with the ruling in Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). In Haines, the court ruled that pro se motions should be held to "less stringent standards" than those written by professional attorneys.

**JURISDICTION**

The First Step Act (P.L. 115-391), Sec. 603(B), now allows all federal courts to directly reduce a sentence under the

statutory provisions of Title 18 U.S.C. § 3582(c)(1)(A) without awaiting a motion from the Bureau of Prisons.

The First Step Act amended § 3582(c)(1)(A) to permit Defendants to move a Sentencing Court for modification of a sentence. Federal Courts have jurisdiction pursuant to Title 28 U.S.C. § 1331.

**FORT DIX APPLICATION FORM**

On July 15th, 2020, FCI Fort Dix issued a Compassionate Release/Reduction in Sentence Application Form. At that time FCI Fort Dix Administration notified inmates that this form MUST be completed in order to submit a request for Compassionate Release.

The form is incorrect in that it directs inmates to: "Choose one criteria: You can only apply under one criteria." But the form does not provide for the modification of 18 U.S.C. § 3582 that was affected by Section 603(B) of the First Step Act.

Congress amended § 3582 with the explicit goal of "increasing the use and transparency of Compassionate Release." (See: First Step Act 603(B)), presumably because prior to the modification, when access to the Courts for § 3582 review depended on a BOP motion, the Compassionate Release statute was under-utilized. In order to aid in this expansion, Congress established a "catch-all" provision outside of those defined by the BOP; a non-categorical "other" extraordinary and compelling reason for release. (See: United States v. Redd, U.S. Dist. LEXIS 45977 (2020).

> "Dependence on the Bureau of Prisons to determine the existence of an extraordinary and compelling reason . . . is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act . . . The amended § 3582 vests Courts with independent discretion to determine whether there are "extraordinary and compelling reasons" to reduce a sentence."
>
> United States v. Scott
> U.S. Dist. LEXIS 84313 (2020)

By utilizing prior practices of demanding a categorical application through the Warden, and not expressly indicating to its inmates that there is a non-categorical "catch-all" provision under which to apply, the BOP, through the administration at FCI Fort Dix, is attempting to take back the authority to determine an inmate's suitability for Compassionate Release, when this independent authority is vested in the Courts, not the Bureau of Prisons.

Congress's attempts to broaden the use of Compassionate Release are being thwarted by the BOP by imposing restrictions on its prisoners that no longer exist. Accordingly, the Petitioner asserts that his attempts to petition the Warden at his facility have been thwarted by the arbitrary administrative procedures set in place that block him from taking the necessary steps to seek Compassionate Release at the facility level. This being a time of serious, life-threatening dangers to its inmate population has not altered the BOP's obstructive position, which directly defies Congress's recent mandate to expand its use of Compassionate Release under P.S. 5050.50.

## BACKGROUND

### Charge and Conviction

1. Gerson Pelagio Suarez was arrested on May 24, 2016, and charged with Possession with Intent to Distribute Narcotics on a Vessel, in violation of 46 U.S.C. § 70503; and Conspiracy to Manufacture or Distribute Narcotics on a Vessel, in violation of 46 U.S.C. § 70503.

2. Mr. Suarez pled Guilty in April of 2018, in the Southern District of New York.

3. Mr. Suarez was found Guilty on April 5, 2018 and sentenced to 292 months incarceration, to be followed by 5 years of Supervised Release.

4. Mr. Suarez appealed his conviction before the Second (2nd) Circuit Court of Appeals in 2019, due to Jurisdictional Conflict, and the conviction was AFFIRMED.

5. Mr. Suarez is incarcerated at FCI Fort Dix - Low, with a projected release date of February 23rd of 2037, and is currently ineligible for Home Detention because he is not a U.S. citizen. He has completed approximately 20% of his sentence.

   (A copy of Mr. Suarez's Sentence Computation Data Sheet is attached.)

### Medical History

Petitioner has been suffering from chronic and debilitating illness that include(s):

- Hypertension
- High Cholesterol
- Osteoarthritis
- Obesity (BMI 30)
- Former Smoker (21 years)

For which Petitioner is prescribed the following medications:

| | |
|---|---|
| ° Hydro Chlorothiazide | 12.5mg daily |
| ° Lisinopril | 1/day |
| ° Diphenhydramine HCI | 50mg 1/day |
| ° Doxycycline Monohydrate | 100mg 2/day |
| ° Atorovastatin | 10mg 1/day |
| ° Acetaminophin | 325mg 3/day |
| ° Aspirin | 81mg 1/day |
| ° Ibuprofen | 800mg 3/day |

These pre-existing conditions are linked to higher hospitalization and fatality rates among COVID-19 patients. See: Safiya Richardson, et. al, Presenting Characteristics, Comorbidities and Outcomes among 5,700 Patients Hospitalized with COVID-19 in the New York City Area, JAMA (Apr. 22, 2020).

Since his incarceration, Mr. Suarez has continued to struggle with his medical issues, all exacerbated by the substandard medical care provided by the medical staff at FCI Fort Dix. Mr. Suarez has reported ongoing medical issues to staff, but prompt and sufficient treatment for his needs have fallen on deaf ears.

Petitioner also has a significant familial medical history, increasing his comorbidity risk level. Mr. Suarez's

family members suffer from Diabetes, Cancer (Pancreatic), High Blood Pressure, High Cholesterol, and Anxiety.

## DISCUSSION

The Centers for Disease Control & Prevention (CDC) reported that individuals over the age of 65, with underlying medical conditions are at the highest risk for infection and death from COVID-19. But, by the end of July, approximately 41% of people hospitalized within the United States were between the ages of 20 and 58. On June 25th, the CDC revised their guidelines to include Obesity (Body Mass Index over 30) and history of Smoking.

In February of 2020 the Bureau of Prisons (BOP) acknowledged that they were unprepared and ill-equipped to handle an outbreak of COVID-19 within the Federal prison system. This has been evident from how poorly the BOP handled recent outbreaks at FCI Petersburg, FCI Lewisburg, FDC San Diego, and FCI Manchester. The BOP's website is showing that on August 20th approximately 11,500 Federal inmates, out of the total Federal inmate population of 127,897, have been confirmed infected with COVID-19. This is at a rate of more than 85 cases out of every 1,000 inmates, with 119 dead. The U.S. has 330 million residents, with more than 5.5 million confirmed cases (16 cases out of every 1,000). 169,000 residents have died from the virus. That means inmates in Federal prisons are **6 times more likely** to catch COVID-19, and **TWICE** as likely to die from it!

This sort of circumstance is undoubtedly "extraordinary" and the COVID-19 pandemic alone is a compelling enough reason to grant Compassionate Release. Many courts have embraced this view; See: U.S. v. Gonzalez, No. 2:18-cr-232-TOR, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (released after serving 10% of sentence in light of COVID-19 and health issues, "in normal times defendant's conditions would be manageable, but these are NOT normal times."); U.S. v. Perez, No. 17-cr-513-3(AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (granted Compassionate Release where "[t]he benefits of keeping [defendant] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave" in light of COVID-19); U.S. v. Juan Ledezma-Rodriguez, 2020 WL 3971517, 3:00-cr-00071 (S.D. IOWA) (granted Compassionate Release for health reasons in light of COVID-19, was originally sentenced to LIFE imprisonment).

In a recent "Notice of Alleged Safety or Health Hazards" complaint filed in Federal court by the U.S. Department of Labor, Occupational Safety and Health Administration (OSHA), against the Federal Bureau of Prisons, which they called an "Imminent Danger Report" pursuant to OSHA of 1970, Executive Order 12196, 29 C.F.R. 1960.8, Agency's Responsibilities, BOP Program Statement 1600.011:

> "The agency's (BOP) actions described herein are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities. The agency's actions and

> inactions are expected to result in death and severe health complications and/or possible life-long disabilities."

It further states:

> "The Bureau of Prisons has failed to introduce controls to mitigate or prevent exposure or further exposure to the virus."

Dating back to February of 2020, FCI Fort Dix has many confirmed cases of COVID-19 amongst staff and inmates. The Petitioner resides on the West Compound in Building 5812. Inmates who have tested positive are being held in building 5851 on the West Compound. Building 5851 overlooks the West Compound Commissary (building 5850), and quarantined inmates in 5851 talk through open windows with West Compound inmates shopping at Commissary. The BOP does limited testing of inmates, with approximately 35% of Federal inmates having been tested thus far; 43,758 tested of 127,897 total inmates. The BOP has a disclaimer on their website stating that their reporting is not accurate and that they are only reporting CURRENT positive tests.

This means that the Federal prison at FCI Fort Dix could quickly become a veritable "death trap" for someone with pre-existing medical conditions and a medical history similar to Petitioner.

**"Prisons are tinderboxes for infectious disease."**

United States v. Rodriguez, No. 03 Cr. 271 (AB) ECF Docket No. 135 (E.D. Pa. Apr. 1, 2020) (granting inmate's compassionate release motion and collecting research explaining the greater

risk of infectious disease spread in detention facilities); see also United States v. Jose Maria Marin, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020) (granting compassionate release to defendant based on special risks he faced from COVID-19 in BOP custody).

## COMPASSIONATE RELEASE

Due to the ongoing COVID-19 pandemic, as per Attorney General Barr's directive, Mr. Suarez filed a petition with the Warden for Compassionate Release and tranfer to his home country of Curacao,

in accordance with Bureau of Prisons Program Statement 5050.50, Compassionate Release/Reduction in Sentence, 18 U.S.C. § 3582(c)(1)(A), and the CARES Act of 2020. Mr. Suarez clearly indicated which category he is filing under in his request; "Other" Extraordinary and Compelling Reason.

There are four prerequisites to a court's granting Compassionate Release under the First Step Act of 2018. First, the petitioner must have exhausted his administrative rights with the Bureau of Prisons. Second, the Court must find that "extraordinary and compelling reasons warrant" release. Third, the Court must consider the factors set forth in § 3553(a). Fourth, the Court must find that release is consistent with the Sentencing Commission's Policy Statement.

## EXHAUSTION OF ADMINISTRATIVE RIGHTS

A prisoner exhausts his Administrative Rights when the

BOP fails to bring a § 3582 motion on his behalf and he exercises all administrative rights to appeal, or after the lapse of thirty (30) days from the receipt of such a request, whichever is earlier.

Gerson Pelagio Suarez filed his Request for Compassionate Release to the Warden at FCI Fort Dix on August 16, 2020, and the BOP has not yet filed a § 3582 motion in court on his behalf.

We ask this Court to waive the exhaustion requirement in this case. "Even where [administrative] exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute." Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019). A court may waive an administrative exhaustion requirement "where [exhaustion] would be futile . . . where the administrative process would be incapable of granting adequate relief . . . [or] where pursuing agency review would subject [the person seeking relief] to undue prejudice." Id. at 118-19 (citing McCarthy v. Madigan, 503 U.S. 140, 146-48 (1992), superseded by statute on other grounds as recognized in Booth v. Churner, 532 U.S. 731, 740 (2001)). "Undue delay, if it in fact results in catastrophic health consequences," can justify waiving an administrative exhaustion requirement for any of those three reasons. Id. at 120-21. "Exhaustion isn't required when delay would subject petitioner to irreparable harm." Carlin v. Peters,

2000 U.S. Dist. LEXIS 10298 (3rd Cir.); United States v. Colvin, No. 3:19-CR-179, 2020 WL 1613943, at *2 (D. Connecticut, April 2, 2020) (finding that Petitioner seeking Compassionate Release relating to COVID-19 exhausted administrative remedies where exhaustion would be futile, the administrative process would be incapable of granting adequate relief, and pursuing agency review would subject Petitioner to undue prejudice).

Under the current exigent circumstances of the COVID-19 virus, exhaustion is excused, because no matter how quickly the Petitioner pursues an additional administrative process, the harm suffered while waiting for exhaustion is irreparable. The densely populated conditions and facility design at FCI Fort Dix exposes the Petitioner to heightened risk of exposure to the disease, in violation of his constitutional rights. Such constitutional injury is irreparable.

As a practical matter, the Petitioner cannot meaningfully engage in any administrative remedy process quickly enough to protect him from the risk of contracting COVID-19 from the people in the facility who have already contracted the virus, and the catastrophic health consequences such infection would cause. Exhaustion is futile because the BOP cannot or will not provide the relief requested in this petition. The only administrative process even ostensibly available to the Petitioner here is the BOP's Administrative Remedy Program (ARP). However, ARP is a lengthy (6+ months) process that does not

provide the requested relief or enlargement of custody or, ultimately, release.

It would be futile for the Petitioner to wait for a response, or non-response from the BOP, when the District Court has the authority to rule on this issue.

Given the historical response time to Administrative Remedy filings, the increased numbers of filings in response to current conditions within the prison system, and taking into account the time already elapsed in Petitioner seeking redress, it is not unreasonable to assume that six or more months would elapse before exhaustion is complete. The Administrative Remedy process was never designed to provide a rapid response due to an external factor, such as the current COVID-19 pandemic.

In sum, the extraordinary circumstances of an existing COVID-19 outbreak already at FCI Fort Dix -- especially the risk it poses to people who are medically vulnerable individuals housed there such as the Petitioner - render further exhaustion a total barrier to any effective relief.   For each of these independent reasons, to whatever extent the Petitioner is deemed not to have exhausted by virtue of his Compassionate Release and/or Home Confinement applications, the Petitioner asserts that he should be excused from the requirement of exhausting administrative remedies.

Petitioner requests the Court to immediately begin its review and arbitration.   Petitioner's underlying medical

conditions, coupled with his potential for exposure at FCI Fort Dix means that "time is of the essence." Petitioner asks this Court to waive the exhaustion time requirement.

**EXTRAORDINARY AND COMPELLING REASONS**

The Court should find that extraordinary and compelling reasons warrant Mr. Suarez's release from prison. The Sentencing Commission has issued a Policy Statement that defines "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018) ("USSG"); see United States v. Ebbers, No. (54) 02-CR-1144-3 (VEC), 2020 WL 91399 at *4 (S.D.N.Y. Jan. 8, 2020); United States v. Bellamy, No. 15-165 (8) (JRT/LIB), 2019 WL 3340699, at *2 (D.Minn, July 25, 2019).

The BOP has actively attempted to obfuscate the true nature and extent of the pandemic. Dr. Turner-Foster, Clinical Director at FCI Fort Dix in April 2020, when asked about confirmed cases of COVID-19 at FCI Fort Dix, stated that, "All such inmates are in the minimal security camp isolated together as a unit. The camp is physically isolated outside of the low security compound." Furando v. Warden Ortiz, Civ. Action No. 20.3779 (RMB) (April 2020).

This is patently false. Inmates testing positive for COVID-19 at the camp are brought within the FCI Fort Dix Low (West) Compound and housed on the second and third floors in Building 5851. This building also houses the central laundry

facilities where both staff and inmates work, a situation with potentially disastrous consequences. Furthermore, this building faces the Fort Dix West Commissary. Quarantined inmates interact through open windows with West Compound inmates shopping at Commissary. Within the building, quarantined inmates are not required to wear PPE (Personal Protective Equipment). Staff members move freely from the quarantine unit into other housing units, based on the security and administrative activities assigned to that staff member. PPE is not stringently used by all staff members. When an infected inmate needs to be transported to/from the medical buildings, he must pass almost every housing unit along the way, posing a health threat to the entire West Compound.

## 3553(a) FACTORS

The overriding factors under 3553(a) that were not present at the time of Petitioner's sentencing are the COVID-19 pandemic and the serious risk and exponential chance of death or irreparable harm if he should contract the COVID-19 virus. The purpose of "Just Punishment" does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition against Cruel and Unusual Punishment includes unreasonable exposure to dangerous conditions in custody. See: Helling v. McKinney, 505 U.S. 28 (1993); See Also: Wellis v. Baldwin, 70 F.3d 1074 (9th Cir. 1991) (applying Helling to exposure to asbestos); Brown v. Mitchell, 327 F.Supp

2d 615, 650 (E.D. Va. July 28, 2004) (applying Helling to "contagious diseases" caused by overcrowding conditions.)

The Eighth Amendment also guarantees inmates in BOP custody the right to adequate medical care for a serious medical need. See: Farmer v. Brennan, 51 U.S. 825, 832 (1994); Estelle v. Gamble, 429 U.S. 97, 103-105 (1976). One court recently invoked the Eighth Amendment in granting a motion for Compassionate Release, noting "a reduction of [defendant's sentence] will enable [defendant] to seek, from the hospitals of his choice, better medical care than the BOP is obligated or able to provide, particularly given the very real threat that COVID-19 poses in the institutional environment." United States v. Williams, No. 3:04-cr-95-MCR-ASK, 2020 WL 1751545 (N.D. Fla. April 1, 2020).

According to the CDC, a person with zero (0) comorbidity factors has about .9% chance of death from COVID-19 infection. Mr. Suarez has **FIVE (5)** comorbidity factors, which creates an exponentially greater chance of death if he contracts COVID-19.

## EXPEDITED / EMERGENCY REVIEW

In light of the immediate threat to the health of the Petitioner caused by this pandemic, he moves the Court to adjudicate this motion with urgency.

I. THIS COURT HAS AUTHORITY TO RESENTENCE PETITIONER UNDER SECTION 3582(c)(1)(A) FOR THE EXTRAORDINARY AND COMPELLING REASONS PRESENTED HERE.

With the changes made to the Compassionate Release statute by the First Step Act, courts need not await a motion from the Director of the BOP to resentence prisoners to time served under 18 U.S.C. § 3582(c)(1)(A) for "extraordinary and compelling reasons," and the reasons that can justify resentencing need not involve only medical, elderly, or family circumstances.

No longer does the Court follow United States v. Gomez-Morales, 528 F. Supp. 2d 13, 14 (D.P.B.) If the Bureau of Prisons denies or ignores Petitioner's request or acts in an arbitrary manner, Petitioner's request becomes subject to judicial review under the First Step Act of 2018.

II. PETITIONER HAS EXTRAORDINARY AND COMPELLING REASONS WHY HIS SENTENCE SHOULD BE REDUCED.

An inmate may initiate a request for consideration under 18 U.S.C. § 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the Court at time of sentencing.

The outbreak of COVID-19 within the Petitioner's own prison, FCI Fort Dix, coupled with Petitioner's age and preexisting medical conditions means that Petitioner is at a MUCH greater risk for contracting COVID-19, and for serious complications and possible death if he does become infected.

In a recent (April 29, 2020) "Declaration" by Doctor

Joe Goldenson, MD, member of the Board of Directors of the National Commission on Correctional Health Care, and past President of the American Correctional Health Services Association, he states that:

> "COVID-19 poses a serious risk to prisoners, workers, and anyone else in detention facilities. Detention facilities, including prisons like FCI Fort Dix, have long been associated with high transmission probabilites for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis."

He further states:

> "Current CDC recommendations for social distancing, frequent hand washing, and frequent cleansing of surfaces to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in a correctional setting like FCI Fort Dix. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical / mechanical risks such as overcrowding; population density in close confinement; insufficient ventilation; shared toilet, shower, and eating environments; and limits on hygiene and personal protective equipment such as masks and gloves . . . shared spaces and equipment (such as telephones) are commonly not adequately disinfected, especially during the current pandemic when more frequent cleaning and disinfecting are required."

Doctor Goldenson further states:

> "**It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as FCI Fort Dix** . . . Based on these understandings, it is my opinion that the exponential rate of infection for COVID-19 we already see in the community would be magnified within FCI Fort Dix."

In his conclusion, Dr. Goldenson declares the following:

> "It is my professional opinion that persons currently detained at FCI Fort Dix are at significantly greater risk of contracting COVID-19 than if they were

> permitted to shelter in place in their home communities. If infected, many [inmates at Fort Dix] are at increased risk of suffering severe complications and outcomes. It is my professional opinion that conditions in FCI Fort Dix threaten the health and safety of every individual within the prison - detained persons and staff alike - and in their surrounding communities . . . a necessary component of bringing FCI Fort Dix into compliance with the recommendations of the CDC to minimize the risk of COVID-19 transmission within the facility . . . is to substantially reduce the population . . . those who are . . . medically vulnerable need to be moved out of FCI Fort Dix to the absolute maximum extent possible."

The anxiety Mr. Suarez suffers knowing that any inmate or staff he comes into contact with could be carrying his death sentence, constitutes cruel and unusual punishment. Ignoring serious medical needs of an incarcerated person while under the threat of death from a virus pandemic violates the "cruel and unusual punishment" prohibition of the Eighth Amendment.

The prima facie evidence in this case is overwhelming. Mr. Suarez has included copies of his medical records. (See Attached) Furthermore, Mr. Suarez's prison medical records do not adequately convey his complete health picture. The Fort Dix medical department is understaffed, overwhelmed, and some are deliberately indifferent towards Mr. Suarez.

III. PETITIONER HAS EXTRAORDINARY AND COMPELLING REASONS JUSTIFYING A SENTENCE REDUCTION.

Petitioner's current sentence presents "extraordinary and compelling reasons" that warrant a sentence reduction for the following reasons:

1) Gerson Pelagio Suarez is 53 years old and has already completed 20% of his time, and;

2) Mr. Suarez has completed a commendable amount of programming while incarcerated, and;

3) Mr. Suarez's underlying medical condition, and Body Mass Index of 30 (Obese) puts him at a "High Risk" for infection and death from the COVID-19 virus. This risk is elevated further by his 21 year history of smoking cigarettes.

**RELEASE PLAN**

Gerson Pelagio Suarez will, if allowed, reside with his elderly mother and father, who's health conditions are serious, and need Mr. Suarez's assistance to provide care during this difficult time. They will reside at Welatina Weg #66, in Buena Vista, Willemstad, Curacao, 5-999-524-6663 The country of Curacao has only 26 confirmed cases of COVID-19 at the time of this writing.

**CONCLUSION**

The Petitioner, Gerson Pelagio Suarez, pleads and prays for relief from this Honorable Court. He is a low risk for recidivism; he has a home and loving family to return to; he has a detailed release plan that includes a job and continuing education, and; he presents no danger to the public.

Mr. Suarez understands that his crime in the instant case was serious and should not be taken lightly. This does not

mean, however, that his sentence of 292 months should become a death sentence. Mr. Suarez asks only to be released to be with his family during this ongoing global catastrophe; to support and protect his loved ones; have access to medical care that he may need that the BOP is unable and ill-equipped to provide, and; to begin rebuilding his life.

IV. THE COURT SHOULD EXERCISE ITS DISCRETION AND RESENTENCE PETITIONER TO TIME SERVED.

Petitioner's release date without the granting of this Motion is currently scheduled for February 23, 2037.

WHEREFORE, the Petitioner, Gerson Pelagio Suarez, respectfully moves this Honorable Court to (1) reconsider the length of his sentence and grant him TIME SERVED, and (2) order his return to his home country of Curacao / Netherlands Antilles.

Respectfully submitted,

Date: August 30, 2020

Gerson Pelagio Suarez
Reg. No. 75878-054
FCI Fort Dix - Low
P.O. Box 2000
Joint Base MDL, NJ 08640

**DECLARATION**

I, Gerson Pelagio Suarez, declare under the Penalty of Perjury that the aforementioned statement by me was true and correct to the best of my knowledge, pursuant to 28 U.S.C. § 1746.

Date: August 30 2020

Gerson Pelagio Suarez
Reg. No. 75878-054

**CERTIFICATE OF SERVICE**

I, Gerson Pelagio Suarez, hereby certify that I placed a copy of the foregoing motion in the FCI Fort Dix mailbox, located in Burlington County, New Jersey, on the date listed below, with all necessary pre-paid, U.S.P.S. First-Class postage attached, and addressed to the following recipient(s):

Clerk of Court
Honorable Richard Sullivan
U.S. District Court
Southern District of New York
Foley U.S. Courthouse
445 Broadway / Room 509
Albany, New York 12207

Due to COVID-19 related closure at Fort Dix I am unable to obtain address information for the Office of the U.S. Attorney. I hereby request that the U.S. Attorney be served a copy of this motion electronically.

Date: August 30 2020

Gerson Pelagio Suarez
Reg. No. 75878-054
FCI Fort Dix-Low
P.O. Box 2000
Joint Base MDL, NJ 08640

REGNO..: 75878-054 NAME: SUAREZ, GERSON PELAGIO

FBI NO...........: DATE OF BIRTH: 10-08-1966 AGE: 53
ARS1.............: FTD/A-DES
UNIT.............: UNIT 5812 QUARTERS.....: Q03-134L
DETAINERS........: YES NOTIFICATIONS: NO

HOME DETENTION ELIGIBILITY DATE: 08-23-2036

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE: 02-23-2037 VIA GCT REL

---------------------CURRENT JUDGMENT/WARRANT NO: 010 ----------------------

COURT OF JURISDICTION...........: NEW YORK, SOUTHERN DISTRICT
DOCKET NUMBER...................: 16-CR-453-2
JUDGE...........................: SULLIVAN
DATE SENTENCED/PROBATION IMPOSED: 04-05-2018
DATE COMMITTED..................: 05-01-2018
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

| | FELONY ASSESS | MISDMNR ASSESS | FINES | COSTS |
|---|---|---|---|---|
| NON-COMMITTED.: | $200.00 | $00.00 | $00.00 | $00.00 |

RESTITUTION...: PROPERTY: NO SERVICES: NO AMOUNT: $00.00

------------------------CURRENT OBLIGATION NO: 010 -------------------------
OFFENSE CODE....: 859 46:1903 MARITIME DRUG
OFF/CHG: 46:70503 CONSPIRACY TO MANUFACTURE OR DISTRIBUTE NARCOTICS ON VESSEL.46:70503 POSSESSION WITH INTENT TO DISTRIBUTE NARCOTICS ON VESSEL

SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.: 292 MONTHS
TERM OF SUPERVISION............: 5 YEARS
DATE OF OFFENSE................: 05-24-2016

```
  FTDC1  540*23 *            SENTENCE MONITORING           *      06-17-2020
PAGE 002        *              COMPUTATION DATA            *      08:20:30
                               AS OF 06-17-2020

REGNO..: 75878-054 NAME: SUAREZ, GERSON PELAGIO

-------------------------CURRENT COMPUTATION NO: 010 --------------------------

COMPUTATION 010 WAS LAST UPDATED ON 11-05-2019 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 06-15-2018 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

DATE COMPUTATION BEGAN..........: 04-05-2018
TOTAL TERM IN EFFECT............:   292 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:    24 YEARS       4 MONTHS
EARLIEST DATE OF OFFENSE........: 05-24-2016

JAIL CREDIT.....................:   FROM DATE     THRU DATE
                                    05-24-2016    04-04-2018

TOTAL PRIOR CREDIT TIME.........: 681
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 1307
TOTAL GCT EARNED................: 209
STATUTORY RELEASE DATE PROJECTED: 02-23-2037
TWO THIRDS DATE.................: 08-13-2032
EXPIRATION FULL TERM DATE.......: 09-22-2040
TIME SERVED.....................:     4 YEARS      25 DAYS
PERCENTAGE OF FULL TERM SERVED..:  16.7
PERCENT OF STATUTORY TERM SERVED:  19.6

PROJECTED SATISFACTION DATE.....: 02-23-2037
PROJECTED SATISFACTION METHOD...: GCT REL

REMARKS.......: 6-15-2018:COMP ENTERED.D/KXR 3-28-19: GCT UPDT D/SYT.
                11-5-19: GED UPDATE D/SYT.

G0002        MORE PAGES TO FOLLOW . . .
```

INMATE REQUEST TO STAFF

| | | | |
|---|---|---|---|
| TO: | David Ortiz, Warden | Date: | August 16, 2020 |
| FROM: | **Gerson Pelagio Suarez** | Reg. No. | 75878-054 |
| Inst.: | FCI Fort Dix | Unit: | 5812 |

---

REQUEST FOR COMPASSIONATE RELEASE
Pursuant to 18 U.S.C. § 3582(c)(1)(A),
as amended by the First Step Act of 2018,
(P.L. 115-391): and the CARES Act of 2020,
(P.L. 116-136 134 Stat. 281 (Mar. 27, 2020))

---

I, **Gerson Pelagio Suarez**, respectfully request that the Bureau of Prisons (BOP) grant me Compassionate Release, and reduce my sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), and 28 C.F.R. § 571.61. I request immediate release from custody and transfer to my home country of Curacao / Netherlands Antilles. My request for Compassionate Release is based upon "Extraordinary and Compelling reasons," which could not have reasonably been foreseen at the time of my sentencing.

The United States is currently in the midst of a global pandemic caused by novel Coronavirus 2019 (COVID-19). As of August 16th, 2020, there are 5,350,000 confirmed infected people in the United States, with tens of thousands more confirmed cases every day. I am seeking a reduction in sentence based on extraordinary and compelling reasons, namely my increased vulnerability to the COVID-19 virus, coupled with the risk of outbreak of COVID-19 at my prison of confinement, FCI Fort Dix.

The Bureau of Prisons (BOP) is reporting continued infections of COVID-19 at nearly 100 Federal prisons, with more than 11,300 prisoners having tested positive. With the virulant nature of COVID-19, it is expected that the number of infections will continue to grow exponentially.

In two recent reports by the BOP they acknowledged that the Federal prisons were unprepared and ill-equipped to support an outbreak of COVID-19. The Center for Disease Control (CDC) reported that people with underlying medical conditions, are obese (BMI over 30), or have a history of smoking cigarettes are at the highest risk for infection and death from COVID-19. This means that the Federal prison here at FCI Fort Dix could quickly become a veritable "death trap" for someone with serious underlying medical conditions and a medical history similar to mine.

There are currently 127,897 inmates being held in Federal prisons, 11,299 of those have tested positive for COVID-19. One hundred and eleven (111) of those inmates have already died from the virus. That means that 86 out of every 1,000 Federal inmates are infected with COVID-19, and that 1 out of every 1,000 Federal inmates died from the virus. Compared to the national average of 15 infections for every 1,000 American citizens, and 1 death out of every 2,000 residents. This means that I am **6 times more likely to catch COVID-19 while in a Federal prison**, and twice as likely to die if I do catch COVID-19.

On August 16, 2020 the BOP reported that FCI Fort Dix has only performed COVID-19 testing on 296 of the approximate 3,000 inmates (less than 10%), and 38 of those have tested positive.

In my home country of Curacao / Netherlands Antilles, there are 27 confirmed cases of COVID-19. There are 0 cases in the prison at Curacao.

**"Prisons are tinderboxes for infectious disease."**

United States v. Rodriguez, No. 03 Cr. 271 (AB) ECF Docket No. 135 (E.D. Pa. Apr. 1, 2020) (granting inmate's compassionate release motion and collecting research explaining the greater risk of infectious disease spread in detention facilities); see also United States v. Jose Maria Marin, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020) (granting compassionate release to defendant based on special risks he faced from COVID-19 in BOP custody);

In a recent class-action lawsuit brought into Federal court by the ACLU-NJ against FCI Fort Dix, (See: Wragg vs. Warden David Ortiz, FCI Fort Dix (April 2020)), Dr. Joe Goldenson, former President of the American Correctional Health Services Association, and member of the Board of Directors

of the National Commission on Correctional Health Care, states that:

> "It is my professional opinion that persons currently detained at FCI Fort Dix are at significantly greater risk of contracting COVID-19 than if they were permitted to shelter in place in their home communities. If infected, many are at increased risk of suffering severe complications and outcomes."

Dr. Goldenson goes on to say:

> "Those who are medically vulnerable[1] need to be moved out of FCI Fort Dix to the absolute maximum extent possible."

Lastly, Dr. Goldenson states:

> "It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as FCI Fort Dix."

My request is based upon the First Step Act of 2018 and the law signed by President Trump on March 27, 2020, named the Coronavirus Aid, Relief and Economic Security Act (CARES Act). The CARES Act was created to provide emergency assistance to people affected by the COVID-19 virus outbreak.

On March 26, 2020, in a memorandum from the U.S. Attorney General, William Barr, he instructed the BOP to prioritize the granting of home confinement to individuals based on each person's:

- Age and Medical Vulnerability to COVID-19
- Facility Security Level
- Conduct in Prison
- PATTERN and Risk Assessment Score
- Re-entry Plan, and
- Crime of Conviction

---

1 "All current and future persons held at Fort Dix of ANY AGE who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease, or other chronic conditions associated with impaired heart function; (c) chronic liver or kidney disease . . . (d) diabetes or other endocrine disorders; (e) neurological and neurologic and neurodevelopment conditions . . . or spinal cord injury; (f) hypertension; (g) compromised immune systems (such as from Cancer, HIV . . . or other autoimmune disease); (h) blood disorders; (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; (l) and obesity.

AGE & VULNERABILITY TO COVID-19

The Center for Disease Control lists the most vulnerable group being those over the age of 65 with underlying medical conditions. But, people of ANY AGE are susceptible to the COVID-19 virus. National records show that by the end of March 2020, across the United States, 38% of those hospitalized with COVID-19 were between the ages of 20 and 54 (Dr. Brie Williams, Affidavit, March 27, 2020)

I am a qualified candidate for Compassionate Release as I am 53 years old, and my medical conditions fall within the CDC Guidelines of vulnerabilities. I am at a HIGH RISK of contracting COVID-19 because of my documented chronic medical conditions, which include:

° Hypertension
° High Cholesterol
° Osteoarthritis
° Former Smoker (21 years)
° Body Mass Index of 30 (Obese)

I am prescribed the following medications:

° HydroCHLOROthiazide 12.5 MG
° Lisinopril 5 MG
° diphenhydrAMINE HCI 50 MG/ML
° methylPREDNISolone Acetate 80 MG/ML
° Atorvastatin 10 MG
° Ibuprofen 800 MG
° Aspirin 81 MG

These medical conditions are comorbidity factors for COVID-19 and debilitate my immunological system strength, thus increasing my chance of infection and death from the Coronavirus. My family has a history of serious medical issues including Cancer (Pancreatic), Diabetes, High Cholesterol, High Blood Pressure, Depression, and Anxiety. This familial medical history furthers my vulnerability and risk to COVID-19.

SECURITY LEVEL & CONDUCT

I am at a LOW SECURITY level institution (FCI Fort Dix - Low), and I have no incident / disciplinary actions on my record. I have acclimated

well in prison and have completed necessary programming while incarcerated, programming that includes myriad adult continuing education courses.

I am rehabilitated and ready to be a productive member of my community.

**RISK ASSESSMENT / PATTERN SCORE**

The BOP has provided me a PATTERN / Risk Score of MINIMUM (the lowest possible risk). I am a Non-Violent Offender, nor do I have any gang affiliation. I have a job waiting for me, a loving family, and a home to return to. I have strong ties within the community. I pose ZERO threat to my community or to the public.

My arrest and incarceration have been a wakeup call. I am a First-Time Offender who made some serious mistakes due to the lure of easy money. I realize now that my family is what's most important in my life. I have spent my time in prison stoically waiting to rejoin my family and my community; to lift the veil of misery that my incarceration has caused the people that I love. I am determined to leave prison a better father, a better husband and a better son. This will only be a dark spot in an otherwise brilliant life. I just need one opportunity to make things right.

**RELEASE PLAN**

First, I plan to Self-Quarantine with my elderly mother (78 years old) and father (83 years old). We will live at our family home at Welatina Weg. #66 in Buena Vista, Willemstad, Buracao. 5-999-524-6663.

Second, my plan for returning to the community includes going back to work in Trucking Freight. I have owned multiple small businesses in Curacao, and plan to return to managing my own small business. Third, I plan to take online courses to further my education and make me a more competitive and versed businessman. Last, I plan to obtain medical insurance through my state insurer (Medicare / Medicaid) until such time as I can obtain my own medical insurance.

My family will support me financially until I am able to start work and begin earning an income to support myself.

## CONCLUSION

As you can see, I am an excellent candidate for a reduction of sentence for "Extraordinary and Compelling Reasons" due to my elevated risk of infection if exposed to COVID-19, and subsequent risk for catastrophic health consequences if infected. My underlying medical conditions, coupled with a 21 year history of smoking puts me in the highest level of risk. I have completed almost 20% of my sentence; I am MINIMUM risk for recidivism; I have a home to return to, with support from a loving family, and; I have a detailed release plan that will ensure my successful reentry into society.

I request to be granted Compassionate Release, and that I be immediately released from custody and transferred to my home country of Curacao / Netherlands Antilles, pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by section 603(B) of The First Step Act of 2018.

Respectfully submitted,

Date: August 27 2020

Gerson Pelagio Suarez
Reg. No. 75878-054
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640-5433

Before completing this sheet, please review Program Statement 5050.50, Compassionate Release/Reduction In Sentence, available in the law library.

COMPASSIONATE RELEASE/REDUCTION IN SENTENCE

NAME: Gerson Pelagio Suarez UNIT: 5812 REG#: 75878-054 DATE: August 16, 2020

Who is your Physician (circle): Patel Sceusa Sood Chinwalla UNKNOWN

**Choose One Criteria: You can only apply under one criteria.**

Extraordinary/Compelling Circumstances:

____**Medical Circumstances**

____Terminal Medical Condition- Terminal Diagnosis with 18 months or less life expectancy.

____Debilitated Medical Condition – Illness that has you partially (50%) or completely (100%) disabled.

____**Elderly Inmates**

____"New Law" Elderly Inmates – 70 years old or older, and served 30 years or more of sentence.

____Elderly with Medical Conditions – 65 years old or older and served at least 50% of sentence.

____Other Elderly Inmate- 65 years or older and served at least 75% of sentence or the greater of 10 years.

____**Death or Incapacitation of the Family Member Caregiver of an inmate's dependent child**- provide verifiable documentation the child is "suddenly" without a caretaker, the family member is in an incapacitated state and unable to care for the child.

____**Incapacitation of a Spouse or Partner** – provide verifiable medical documentation of incapacitated state.

**To be completed by inmate:**

Briefly describe your medical condition or non-medical circumstance:

Medical: Hypertension, High Cholesterol, Osteoarthritis, BMI 30 (Obese), 21 yr Smoker All of which are comorbidity factor illnesses for COVID-19 infection.

If you have applied before, has anything changed in your medical condition since your last application (if so, describe):

**Proposed Release Plan (Must have ALL of the following):**

Name and contact information of who you will live with, and the last time you spoke to this person about your release plan:

Mother & Father living in Curacao / Netherlands Antilles Phn: 5-999-524-6663
We spoke one week ago about my release plan.

Address of where you will be living: Welatina Weg. #66 in Buena Vista, Willeinstad, Curacao

Where will you receive medical treatment (if applicable): Local Health Clinic

How will you pay for your medical treatment (if applicable): State Medical Insurance / Family Support

Additional Comments:

Per section 603(b) of the First Step Act amendment to 18 U.S.C. § 3582(c)(1), I choose "Other" extraordinary and compelling reasons that could not have reasonably been foreseen at the time of my sentencing, in light of the COVID-19 pandemic.

 U.S. Consulate General in Curacao

# COVID-19 Information
# Ask a COVID-19 Question

Search for...

Dutch Caribbean COVID-19 Status

Aruba

## Country-Specific Information:

- Aruba has had 111 confirmed cases of COVID-19 within its borders.
- Aruba lifted its "shelter-in-place" order on May 18, 2020, but social distancing protocols remain in effect when in public.
- Aruba lifted its curfew order on May 28, 2020.

## Entry and Exit Requirements:

- Effective March 29, 2020, Aruba limited entry to Aruba to all travelers, except for legal residents of Aruba.
- Aruba has announced some limited relaxations of those travel restrictions for travelers that can present a negative PCR COVID-19 test and the purchase of mandatory health insurance that covers the traveler in Aruba (see links and contact information below in local resources):
  - Flights to and from Bonaire and Curacao resumed on June 15, 2020
  - Flights to and from Canada, Europe, and some Caribbean nations resumed July 1, 2020
  - **Flights to and from the United States resumed on July 10, 2020**

## Local Resources:

- https://www.aruba.com/us/traveler-health-requirements (Includes information on insurance and COVID-19 test requirements) – **Please write to support@aruba.com for specific questions about health requirements to enter Aruba.**
- https://www.facebook.com/watch/?v=623982394991337 (Informative video on new travel requirements)
- https://edcardaruba.aw/ (Required for all travelers)
- https://www.arubavisitorsinsurance.com/ (Required for all travelers)
- https://www.airportaruba.com/coronavirus-covid-19
- https://www.arubacovid19.org/

## Other links:

- COVID-19 crisis page on travel.state.gov
- CDC page on COVID-19
- Aruba Country Specific Information from travel.state.gov

Bonaire

## Country-Specific Information:

- Bonaire has had 5 confirmed case of COVID-19 within its borders.

## Entry and Exit Requirements:

- Effective Tuesday, March 17, 2020 Bonaire limited entry to Bonaire to all travelers, except for legal residents of Bonaire.
- Bonaire has announced some limited relaxations of those travel restrictions for travelers that can present a negative COVID-19 test and proof of health insurance that covers the traveler overseas:
    - Flights to and from Curacao resumed on June 12, 2020
    - Flights to and from Aruba resumed on June 15, 2020
    - Flights to and from Europe resumed on July 1, 2020

- **Bonaire has not yet announced when flights to and from the United States will resume, but most U.S. airlines have cancelled flights until at least August 2020.**
- **The final commercial flight scheduled from Bonaire for the United States of America departed on Saturday, March 28.  Please work with your airline carrier to learn more about when service may resume again.**

## Local Resources:

- http://www.bonaireinternationalairport.com/
- https://english.rijksdienstcn.com/covid-19
- https://www.facebook.com/openbaarlichaamBonaire/

## Other links:

- COVID-19 crisis page on travel.state.gov
- CDC page on COVID-19
- Bonaire Country Specific Information from travel.state.gov

Curacao

## Country-Specific Information:

- Curacao has had 27 confirmed cases of COVID-19 within its borders.
- Curacao lifted its "shelter-in-place" order on May 8, 2020, but social distancing protocols remain in effect when in public.
- Curacao lifted its curfew order on June 5, 2020.

## Entry and Exit Requirements:

- On March 30, 2020, Curacao limited entry to Curacao to all travelers, except for legal residents of Curacao with specific permission from the local government.
- Curacao has announced some limited relaxations of those travel restrictions for travelers that can present a negative COVID-19 test (see links below in local resources):
  - Flights to and from Bonaire resumed on June 12, 2020

- Flights to and from Aruba resumed on June 15, 2020
- Flights to and from Sint Maarten resumed on June 19, 2020
- Flights to and from the Netherlands resumed on July 1, 2020

- Travelers who have been physically present in a high-risk country (including the United States) within the past 14-days cannot enter Curacao.
  - To request an exception in very limited circumstances, travelers must write to reisverificatie.cur@gobiernu.cw to request permission in addition to providing a negative COVID-19 PCR test result and agreeing to a 14-day mandatory quarantine in a quarantine facility at the traveler's expense.
  - Travelers may also wait 14 days in a low-risk third country (Aruba, for example) and then travel to Curacao without quarantine restrictions.

- **Curacao has not yet announced when flights to and from the United States will resume, but most U.S. airlines have cancelled flights until August 2020 at the earliest.**
- **The final commercial flight scheduled from Curacao for the United States of America departed on Sunday, March 22.  Please work with your airline carrier to learn more about when service may resume again.**

## Local Resources:

- https://dicardcuracao.com/portal (Required for all travelers)
- https://www.curacao-airport.com/news/coronavirus-bulletins
- https://gobiernu.cw/corona-virus-anunsionan-publiko/

## Other links:

- COVID-19 crisis page on travel.state.gov
- CDC page on COVID-19
- Curacao Country Specific Information from travel.state.gov

Saba

## .Country-Specific Information:

- Saba has had 3 confirmed cases of COVID-19 within its borders.
- Saba lifted its "lock-down" order on May 11, 2020, but social distancing protocols remain in effect when in public.

## Entry and Exit Requirements:

- Effective March 16, 2020 Saba limited entry to Saba to all travelers except for legal residents of Saba.
- Saba has announced some limited relaxations of those travel restrictions:
  - Effective July 10, passengers from Bonaire, Curacao, Sint Eustatius can travel to Saba without quarantine requirements and can transit via Sint Maarten
  - Effective July 10, passengers from Sint Maarten can travel to Saba without quarantine for essential travel and work only.
  - Effective July 10, passengers from Europe can travel to Saba only for repatriation of residents, essential workers, medical travelers, and medical students and will be subject to quarantine upon arrival.
  - Effective July 10, passengers from the United States (and other countries in North and South America) can travel to Saba only for repatriation of residents, essential workers, medical travelers, and medical students and will be subject COVID-19 testing prior to arrival and additional quarantine upon arrival.

- **All travelers who wish to visit Saba must send an email request to info@Sabagov.nl.**
- Saba has not yet announced when regular flights for passengers from the United States will resume, but the Saba government estimates it should not be expected before October 1, 2020.

## Local Resources

- https://www.facebook.com/notes/public-entity-saba/entry-and-quarantine-policy-saba/3407320699292770/
- https://www.facebook.com/PublicEntitySaba/
- https://english.rijksdienstcn.com/covid-19

## Other links:

- COVID-19 crisis page on travel.state.gov
- CDC page on COVID-19

- Saba Country Specific Information from travel.state.gov


Sint Eustatius

## Country-Specific Information:

- Sint Eustatius has had 2 confirmed cases of COVID-19 within its borders.

## Entry and Exit Requirements:

- Effective July 1, 2020 Sint Eustatius has announced some limited relaxations of its travel restrictions:
    - Passengers from Bonaire, Curacao, Saba, Sint Maarten, and St. Kitts and Nevis can request entry to Sint Eustatius without quarantine restrictions
    - Passengers from Aruba, the Netherlands, Belgium, Germany, and France can request entry to Sint Eustatius, but must comply with a home-based quarantine.
    - Passengers from the United States, the United Kingdom, the Dominican Republic, and most South and Central American countries can request entry to Sint Eustatius, but must comply with a mandatory quarantine in a quarantine facility

- Travelers who wish to visit Sint Eustatius from these locations must send an email request to info.covid19@statia.gov.

## Local Resources:

- https://www.statiagovernment.com/questionnaire (Required for all travelers)
- https://www.statiagovernment.com/key-topics/covid-19
- https://www.facebook.com/euxgov
- https://english.rijksdienstcn.com/covid-19

## Other links:

- COVID-19 crisis page on travel.state.gov
- CDC page on COVID-19
- Sint Eustatius Country Specific Information from travel.state.gov

Sint Maarten

## Country-Specific Information:

- Dutch Sint Maarten has confirmed 79 cases of COVID-19 within its borders.
- French Saint-Martin has also confirmed cases COVID-19 within its borders.
- Sint Maarten lifted its "shelter-in-place" order on May 11, 2020, but social distancing protocols remain in effect when in public.
- Sint Maarten lifted its curfew order on June 15, 2020.

## Entry and Exit Requirements:

- Effective Sunday, March 22, 2020 Sint Maarten limited entry to Sint Maarten to all travelers, including legal residents of Dutch Sint Maarten.
- Sint Maarten has announced some limited relaxations of those travel restrictions for travelers that can present a negative COVID-19 test (see links below in local resources):
    - Flights to and from Aruba, Saba, Sint Eustatius, Anguilla, St. Barthelemy, Martinique, and Guadeloupe resumed on June 19, 2020
    - Flights to and from Bonaire and Curacao resumed on June 19, 2020
    - Flights to and from Antigua and Barbuda, the British Virgin Islands, Dominica, St. Kitts and Nevis, and St. Lucia resumed on June 22, 2020
    - **Flights to and from the United States will tentatively resume on August 1, 2020**

- **The final commercial flight scheduled from Sint Maarten for the United States of America departed on Saturday, March 28. Please work with your airline carrier to learn more about when service may resume again.**

## Local Resources

- https://stmaartenupdates.com/ (travel entry requirements)
- http://www.sintmaartengov.org/government/VSA/Health-Updates/NOVELCORONAVIRUS/Pages/default.aspx
- https://www.facebook.com/SXMGOV/

## Other links:

- COVID-19 crisis page on travel.state.gov
- CDC page on COVID-19

Case 1:16-cr-00453-RJS Document 176 Filed 09/14/20 Page 40 of 48

- Sint Maarten Country Specific Information from travel.state.gov

**Other links**:

- COVID-19 crisis page on travel.state.gov
- CDC page on COVID-19

**For Emergency Assistance:**

- During Office Hours +5999 461 3066
  Outside of Office Hours +5999 843 3066
  Outside of Curacao +1 503 420 3115

This is the official website of the U.S. Consulate General in Curacao. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.



**Declaration of Joe Goldenson, MD**

1. I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director. In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility and the planning and coordination of the jail's response to H1N1, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and am past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3. For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4. I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert and monitor at Cook County Jail in Chicago; Los Angeles County Jail; at other jails in Washington state, Texas, and Florida; and at prisons in Illinois, Ohio, and Wisconsin.

5. My curriculum vitae is attached as exhibit A.

**The nature of COVID-19**

6. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the World Health Organization ("WHO"). Cases first began appearing between December 1 and December 31, 2019, in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

7. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus that caused the 2002–2003 SARS epidemic.

D

8. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.1 to 3.5%, which is up to 35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

9. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardiovascular disease, respiratory disease, diabetes, and immune compromise.

10. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS), which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and in parts of China.

11. COVID-19 is widespread. Since it first appeared in China in late 2019, outbreaks have subsequently occurred in more than 160 countries and all populated continents; heavily affected countries include Italy, Spain, Iran, South Korea, and the U.S. The U.S. is now the world's most affected country. As of April 29, 2020, there have been 3,142,942 confirmed human cases globally and 218,564 known deaths.[1] It is not contained, and cases are growing exponentially.

12. In the United States alone, the Centers for Disease Control and Prevention ("CDC") reports 981,246 cases and 55,258 deaths as of April 28.[2] The New Jersey Department of Health reports 113,856 cases and 6,442 dead as of April 28.[3] All these numbers are likely underestimates because of limited availability of testing.

13. SARS-nCoV-2 is now known to be fully adapted to human-to-human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

14. The U.S. CDC estimates that the reproduction rate of the virus, the R0, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again is

[1] https://coronavirus.jhu.edu/map.html (last accessed April 29, 2020)
[2] https://www.cdc.gov/covid-data-tracker/index.html ((last accessed April 29, 2020)
[3] https://covid19.nj.gov/#live-updates ((last accessed April 29, 2020)

D

likely a function of all human populations currently being highly susceptible. The attack rate given an exposure is also high, estimated at 20–30% depending on community conditions, but may be as high as 80% in some settings and populations. The incubation period is thought to be 2–14 days, which is why isolation is generally limited to 14 days.

15. CDC has recently added to the list of possible signs and symptoms of COVID-19 to include fever, cough, shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell.[4] This means the questionnaires currently used to screen staff and prisoners need to be updated and the numbers of suspect cases will increase.

16. There is currently no vaccine for COVID-19, and no cure. The only known ways to prevent the spread of SARS-nCoV-2 involve measures such as thorough handwashing, frequent decontamination of surfaces, and maintaining six feet of physical distance between individuals ("social distancing").

**The risks of COVID-19 in detention facilities**

17. COVID-19 poses a serious risk to prisoners, workers, and anyone else in detention facilities. Detention facilities, including prisons like Fort Dix, have long been associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

18. The severe epidemic of tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase *community* rates of tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities surrounding a prison.

19. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as social distancing and proper decontamination of surfaces are virtually impossible.

20. For example, several deaths were reported in the U.S. in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May 2019.

21. Current recommendations for social distancing, frequent hand washing, and frequent cleansing of surfaces to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in the correctional setting. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical

[4] Centers for Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

D

complications of these infectious diseases. These include physical/mechanical risks such as overcrowding; population density in close confinement; insufficient ventilation; shared toilet, shower, and eating environments; and limits on hygiene and personal protective equipment such as masks and gloves in some facilities. Shared spaces and equipment (such as telephones) are commonly not adequately disinfected, especially during the current pandemic when more frequent cleaning and disinfecting are required. Limits on soap (copays are common) and hand sanitizer, since they can contain alcohol, are also risks for spread. The nationwide shortage of personal protective equipment (PPE), as well as ancillary products (such as cleaning supplies and thermometer probes) further impacts the ability of correctional facilities to implement necessary precautions.[5]

22. The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing severe complications or death if infected, is significantly higher in jails, prisons, and detention centers than in the community.

23. Close, poorly ventilated living quarters and often overcrowded conditions in these facilities foster the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing, speaking, or coughing. In these congregate settings, large numbers of people are closely confined and forced to share living spaces, bathrooms, eating areas, and other enclosed spaces. Groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria. Persons congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, telephones, or court appearances. These group movements, which may cluster large numbers of people together in small spaces, increase the risk of transmission. It is common for detainees in a given housing unit to routinely be subjected to such group movements multiple times each day. They are physically unable to practice social distancing, which the CDC has identified as the "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[6]

24. This forced congregation spreads infection from one area of a prison to other areas, too. In addition, detention facilities often rely on detainees to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility. Officers and other detention facility staff routinely have direct physical contact with detainees, especially when handcuffing or removing handcuffs from detainees who are entering or exiting the facility Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the

[5] *Study of COVID-19 in Correctional Facilities*, Harvard University and National Commission on Correctional Health Care, April 9, 2020

[6] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

D

facility and transmission to and from detainees in different parts of the facility. This regular circulation makes the spread of infection throughout a prison all but inevitable.

25. While jails, prisons, and detention centers are often thought of as closed environments, this is not the case. Custody, medical, and other support staff and contractors enter and leave the facility throughout the day. New detainees arrive on a frequent basis. Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to those housed in the facility. Detainees and inmates are often transferred between housing units, to other facilities, and to and from court. This further increases the likelihood of transmission of COVID-19.

26. It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission. Due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home to their families and communities.

27. In addition to the nature of the prison environment, prison and jail populations are also at additional risk due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to death or severe illnesses after infection from COVID-19 disease.

28. Testing kits are widely unavailable, and it can take anywhere from a day to a week or more to obtain test results. Someone who is tested shortly after he or she was infected may test negative. Non-test-based screens like taking people's temperatures or asking them for subjective reports of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[7] Similarly, infected individuals may experience only mild symptoms. These newly infected, asymptomatic, and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. As a result, such inadequate screening presents a critical problem. The possibility of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission.

29. While every effort should be made to reduce exposure in detention facilities through internal mitigation efforts, this may be extremely difficult to achieve and sustain quickly

[7] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html

D

OPI: LEGAL DEPARTMENT
Number: FTD 1330.18
Date: November 18, 2014
Attachment: 1

FCI FORT DIX, NEW JERSEY
INFORMAL RESOLUTION FORM (BP-8)

You are advised that prior to receiving and filing a Request for Administrative Remedy Form BP-9, you MUST ordinarily attempt to informally resolve your complaint through your Correctional Counselor. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally and state names of staff contacted.

Date form issued and initials of Correctional Counselor: [signature] 8/7/2020

**INMATE NAME** Gerson Pelagio Suarez
**REGISTER NO.** #5878-054.
**BLDG.** 5812.

Date the incident complained of occurred: August 7 2020

Complaint and relief requested: I want to be transfer to my Home Country in Prison because of the Pandemic – Corona virus – Covid-19.

**CORRECTIONAL COUNSELOR:**

Date BP-8 returned to Correctional Counselor: [signature] 8/7/2020

Efforts made to informally resolve and staff contacted: If you wish to be transferred to your country, you may apply for a treaty transfer.

Date response given to inmate: 8/21/2020 [signature]
Counselor (sign)

Date BP-9 Issued: ____________ ____________
Unit Manager (sign)

If complaint is NOT informally resolved: forward original attached to BP-9 form to the Legal Assistant.

8/21/2020

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | Suarez, Gerson Pelagio | 75878-054 | 5812 | FCI Fort Dix West |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST**

This is my official request for Treaty Transfer to my home country of Curacao / Netherlands Antilles. This request is in light of the recent outbreak of the novel Coronavirus 2019 (COVID-19), my suseptibility to the virus due to my underlying medical conditions, and negligible rate of infection in my home country.

Curacao / Netherlands Antilles has one of the LOWEST infection rates of any country in the world, with only 21 confirmed cases. (See Exhibit A) The United States has the HIGHEST infection rate of any country in the world, with 5½ million confirmed cases of COVID-19, and more than 170,000 deaths. This means there have been nearly 7,000 times more deaths in this country than there are cases of COVID-19 in my home country.

My transfer to the prison system within my home country will mean a dramatic reduction to my risk of infection to COVID-19 virus; it will put me closer to my elderly parents who are unable to travel to the U.S.; and it will result in relief to the American taxpayers.

Please consider me for a Treaty Transfer to my home country of Curacao / Netherlands Antilles. Thank you for your attention and consideration.

August 21, 2020
DATE

SIGNATURE OF REQUESTER

**Part B- RESPONSE**

DATE

WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**

CASE NUMBER: __________

CASE NUMBER: __________

**Part C- RECEIPT**

Return to:



Gerson Pelagio Suarez
Reg. No. 75878-054
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

FOREVER / USA
UNITED STATES POSTAL SERVICE
1000
12207
U.S. POSTAGE PAID
FCM LG ENV
JOINT BASE MDL, NJ
08640
AUG 31, 20
AMOUNT
$0.00
R2305M146244-07

**FEDERAL CORRECTIONAL INSTITUTION**
**P. O. BOX 2000**
**FORT DIX, NJ 08640** 8-31-20

**The enclosed letter was processed through special mail procedures. This letter has been neither opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material. If the writer encloses correspondence for forwarding to another address or includes unauthorized items, please return to the above address.**

Honorable Richard Sullivan
c/o Clerk of the Court
U.S. District Court
Southern District of New York
Foley U.S. Courthouse
445 Broadway / Room 509
Albany, New York 12207

U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK
SEP 02 2020
RECEIVED

RECEIVED
SEP 11 2020
CHAMBERS OF
RICHARD J. SULLIVAN
U.S.D.J.

RECEIVED
SEP 2020
CHAMBERS OF
RICHARD J. SULLIVAN
U.S.D.J.

Legal
mail