UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-

GERSON PELAGIO SUAREZ,

Defendant.

---

No. 16-cr-453 (RJS)
ORDER

RICHARD J. SULLIVAN, Circuit Judge:

Before the Court is Defendant Gerson Pelagio Suarez's *pro se* motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), made in light of the conditions in prison due to the COVID-19 pandemic. (Doc. No. 176 at 2–48 ("Def. Mot."); *see also* Doc. No. 179; Doc. No. 184 ("Reply").) The government opposes that motion. (Doc. No. 177 ("Gov't Opp'n.").) For the reasons set forth below, Suarez's motion is DENIED.

## I. Background

This case began following Suarez's unsuccessful attempt to transport nearly 1,300 kilograms of cocaine from Grenada to Canada onboard a sailboat named the *Sunshine*. (*Id.* at 1.) The scheme was originally hatched in the fall of 2015, before Suarez was involved, by several individuals, including Richard Dow and Stefan Van Der End, both of whom would later become Suarez's co-defendants. (Presentence Investigation Report ("PSR") ¶¶ 11–14.) The original conspirators planned to sail the *Sunshine* south from Grenada to a rendezvous point somewhere near Venezuela, where they would pick up approximately 40 bales of cocaine. (*Id.*) From there, they planned to turn around and make their way up north to Canada. (*Id.*)

In November 2015, Dow, Van Der End, and a third crewmate, set sail. (*Id.* ¶ 13.) But only days after picking up the drugs, the conspirators were forced to return to Grenada in the face of an approaching hurricane. (*Id.* ¶¶ 13–14.) About four months later, the conspirators decided to try again. (*Id.* ¶ 16.) It was then that Suarez was floated as a potential addition to the *Sunshine* crew. (*Id.*) Though Suarez had a job in Curaçao as a security guard at the time (*id.* ¶¶ 67–68), he agreed to join the conspiracy and traveled to Grenada in April 2016 (*id.* ¶ 16; Gov't Opp'n at 1).

The following month, Suarez and the other crewmates spent several days surreptitiously loading dozens of bails of cocaine onto the boat. (PSR ¶ 17.) Eventually, on May 15, 2016, with all the planning and preparation complete, the *Sunshine* set sail again. (*Id.*) But only eight days later, the United States Coast Guard intercepted the boat a few hundred miles off the coast of Bermuda. (*Id.* ¶ 18.) A boarding team discovered some of the bails of cocaine when searching the vessel and took the crewmembers into custody. (*Id.* ¶¶ 18–23.) Suarez was indicted the following month. (Doc. No. 13.)

On May 1, 2017, one week before trial was set to begin (Doc. No. 35), Suarez notified the Court that he intended to assert the affirmative defense of duress (Doc. No. 57). Three days later, the Court held a pre-trial hearing to determine whether there was sufficient evidence to submit that defense to the jury. (Doc. No. 136-2.) At the hearing, Suarez testified under oath that he believed that he was hired to work as a cook for a simple boat delivery job. (*Id.* at 10, 12, 14.) It was not until a few days into the trip, he asserted, that he learned that there were drugs onboard the *Sunshine*, when Dow demanded that he help move several bails of cocaine. (*Id.* at 10–11, 14–15.) Immediately following the hearing, the Court issued an order denying Suarez's request to instruct the jury on duress. (Doc. No. 89.)

Later that same day, Suarez pleaded guilty, without a plea agreement, to one count of possession with intent to distribute narcotics while on a vessel, and another count of conspiring to do the same, both in violation of 46 U.S.C. § 70503. (Doc. No. 101 ("Plea Tr.") at 9, 20–21, 41; Doc. No. 169 at 1.) Nevertheless, Suarez continued to insist that he did not know about the drugs until the boat had already set sail, again testifying under oath that he originally believed that he had been hired as a cook. (Plea Tr. at 40.) In pleading guilty, then, Suarez admitted only that he failed to leave the conspiracy once he learned of its true purpose while in the middle of the ocean. (*Id.*)

In the wake of Suarez's guilty plea, the Court held a *Fatico* hearing to resolve several remaining factual disputes, including the scope of Suarez's role in the conspiracy and whether an obstruction of justice enhancement under the U.S. Sentencing Guidelines was appropriate given the government's assertion that Suarez had testified falsely during both the duress-defense hearing and his guilty plea. (Doc. No. 136-1.) During the *Fatico* hearing, Suarez continued to claim that he did not know about the cocaine until the journey had started. (*Id.* at 138, 155–56.) To rebut that assertion, the government called Dow, who testified credibly that Suarez was always aware that he was hired to help transport drugs to Canada. Among other things, Dow testified that (i) in the days leading up to the voyage, Suarez stayed in the same apartment in which the drugs were stashed (*id.* at 60–62), (ii) Suarez was integral in helping transfer the drugs from the apartment onto the boat (*id.* at 70–77), and (iii) the cocaine bails were stored all over the *Sunshine*, including in the same bunk where Suarez kept some of his belongings (*id.* 88–90, 95).

The Court sentenced Suarez on April 5, 2018. (Doc. No. 160 ("Sentencing Tr.").) At the start of the proceeding, the Court ruled on the disputes presented at the *Fatico* hearing. The Court determined that (i) the amount of cocaine that Suarez was accountable for transporting was more

than one ton, (ii) a role reduction was unwarranted, and (iii) an obstruction of justice enhancement was required given three separate times that Suarez had lied under oath during the case concerning his knowledge about the purpose of the *Sunshine*'s voyage. (*Id.* at 4–5). Those findings, together with the other facts of Suarez's offense and his prior history, resulted in an advisory Guidelines range of 292 to 365 months' imprisonment (*id.* at 5), and a mandatory minimum sentence of 10 years (PSR ¶ 77).

At the completion of the proceeding, the Court principally sentenced Suarez to the bottom end of his Guidelines range: 292 months' imprisonment. (Sentencing Tr. at 32; Doc. No. 169 at 2.) In doing so, the Court highlighted the egregiousness of Suarez's crime, the fact that he had not shown remorse for his actions, and the fact that he had perjured himself three separate times in an effort to minimize his culpability. (Sentencing Tr. at 26–31.)

Suarez is currently being held at FCI Fort Dix in New Jersey. (Def. Mot. at 2.) Thus far, Suarez has served less than twenty percent of his sentence and is not projected to be released until April 2037. (*See* Gov't Opp'n at 1.)

On September 14, 2020, the Court received the instant motion from Suarez, seeking compassionate release because of the COVID-19 pandemic.[1] The government opposes Suarez's request, arguing that although Suarez has established "extraordinary and compelling reasons" warranting a sentence reduction, such a reduction would undermine the goals of his original sentence. (*Id.* at 4–7.)

---

[1] Suarez submitted a compassionate release request to the Warden of Fort Dix around August 17, 2020. (Gov't Opp'n at 3.) The government does not dispute that Suarez has exhausted his administrative remedies as required by section 3582(c)(1)(A). (*Id.*) That is dispositive of the issue. *See United States v. Santibanez*, No. 13-cr-912 (RJS), 2020 WL 3642166, at *2 (S.D.N.Y. July 6, 2020) (recognizing that the exhaustion requirement in the compassionate release statute is "a 'claim processing' rule rather than a jurisdictional bar," and as such can be waived by the government).

## II. Legal Standard

"The Court 'may not modify a term of imprisonment once it has been imposed except pursuant to statute.'" *United States v. Felix*, No. 12-cr-322 (RJS), 2020 WL 4505622, at *1 (S.D.N.Y. Aug. 4, 2020) (quoting *United States v. Roberts*, No. 18-cr-528 (JMF), 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020)). "Section 3582(c)(1)(A) provides one such exception, often referred to as 'compassionate release.'" *Id.* "Through that provision, the Court may 'reduce' a defendant's sentence where 'extraordinary and compelling reasons warrant such a reduction,' and such relief would be consistent with both the factors in 18 U.S.C. § 3553(a) and 'applicable policy statements issued by the Sentencing Commission.'"[2]  *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

## III. Discussion

Suarez identifies several facts that he argues constitute "extraordinary and compelling reasons." To start, he suggests that "the COVID-19 pandemic alone is a compelling enough reason to grant [c]ompassionate [r]elease." (Def. Mot. at 8.) Not so. Courts in this circuit "have consistently recognized that the pandemic itself – without more – does not . . . warrant[]" such exceptional relief. *Felix*, 2020 WL 4505622, at *2 (collecting cases); *see also United States v. Hamed*, No. 17-cr-302 (KPF), 2020 WL 3268657, at *3 (S.D.N.Y. June 17, 2020) (same); *accord United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (explaining that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release").

---

[2] Where, as here, the compassionate release motion was made by the defendant himself, rather than by the Bureau of Prisons, U.S.S.G. § 1B1.13 is not an "applicable" policy statement. *See United States v. Brooker* (*Zullo*), 976 F.3d 228, 235–37 (2d Cir. 2020). As a result, the Court has significant discretion to identify what constitutes "extraordinary and compelling reasons." *See id.*

Next, Suarez suggests that Fort Dix is particularly ill-equipped to handle the ongoing pandemic and that it is currently experiencing a surge in cases. (Def. Mot. at 9, 14–15; Reply at 2–3.) But, again, several courts have denied compassionate release motions submitted by Fort Dix inmates in recent weeks. *See, e.g.*, *United States v. Gibson*, No. 17-cr-657 (JS), 2020 WL 7343802, at *3–4 (E.D.N.Y. Dec. 14, 2020); *United States v. Thatcher*, No. 13-cr-847 (KMK), 2020 WL 7263288, at *1 (S.D.N.Y. Dec. 10, 2020); *United States v. Williams*, No. 16-cr-526 (LGS), 2020 WL 7048244, at *1–2 (S.D.N.Y. Dec. 1, 2020); *United States v. Scronic*, No. 18-cr-43 (CS), 2020 WL 7048245, at *2–3 (S.D.N.Y. Nov. 30, 2020) (noting that the court was "dubious" that the defendant's medication conditions combined with the recent outbreak at Fort Dix constituted extraordinary and compelling reasons); *United States v. Sturgis*, No. 10-cr-6022 (CJS), 2020 WL 7063359, at *5–6 (W.D.N.Y. Nov. 24, 2020). Moreover, the recent outbreak at Fort Dix appears to be subsiding. According to Suarez, on December 4, 2020, there were 136 active cases of COVID-19 at the facility between inmates and staff. (Reply at 2.) Today, there are only 30 active cases. *See* COVID-19, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Dec. 22, 2020). And, perhaps even more importantly, the number of active cases among inmates in particular has fallen precipitously, decreasing from 103 three weeks ago to just 20 today. *See id.*; *see also Gibson*, 2020 WL 7343802, at *4. So, like Suarez's general assertions concerning the COVID-19 pandemic, his arguments concerning the particular circumstances at Fort Dix are simply not enough to merit an early release.

Lastly, Suarez identifies several medical conditions that he says place him at heightened risk of serious complications if he were to become infected with COVID-19. (Def. Mot. at 2.) Several of those medical conditions can easily be dismissed as insufficient to meet the "extraordinary and compelling" threshold set by § 3582(c)(1)(A). Specifically, courts in this

Circuit have rejected requests for compassionate release based solely on the interaction between COVID-19 and hypertension, high cholesterol, or a history of smoking.[3] *See, e.g.*, *Gibson*, 2020 WL 7343802, at *4 (hypertension and incarcerated at Fort Dix); *Sturgis*, 2020 WL 7063359, at *5 (same); *United States v. Elliott*, No. 17-cr-128 (ARR), 2020 WL 4381810, at *4 (E.D.N.Y. July 31, 2020) (smoking); *United States v. Davis*, No. 12-cr-712 (SHS), 2020 WL 3790562, at *3 (S.D.N.Y. July 7, 2020) (hypertension); *United States v. Sattar*, 467 F. Supp. 3d 152, 156 (S.D.N.Y. 2020) (high cholesterol).

A more challenging question is presented by Suarez's obesity, evidenced by a Body Mass Index ("BMI") above 30 (31, to be precise). (Def. Mot. at 2; Gov't Opp'n at 5 n.5.) On the one hand, the Center for Disease Control previously identified only "[s]evere obesity" as a major risk factor for COVID-19 complications – that is, individuals with a BMI of 40 or above. *See United States v. Broadus*, No. 17-cr-787 (RJS), 2020 WL 3001040, at *2 (S.D.N.Y. June 4, 2020); *United States v. Espinal*, No. 08-cr-242 (ARR), 2020 WL 2092484, at *3 n.1 (E.D.N.Y. May 1, 2020). As a result, several courts have previously concluded that a BMI around 30 does not constitute "extraordinary and compelling reasons" meriting a significant reduction in sentence. *See United States v. Prelaj*, No. 16-cr-55 (RJS), 2020 WL 3642029, at *2–3 (S.D.N.Y. July 6, 2020); *Broadus*, 2020 WL 3001040, at *2. However, the Center for Disease Control now identifies a BMI of 30 or above as "increase[ing] [an individual's] risk of severe illness from COVID-19." *Coronavirus Disease 2019 (Covid-19): People with Certain Medical Conditions* (Dec. 1, 2020), Ctr. for Disease Control & Prevention.[4] And because of that fact, the government agrees with Suarez that

---

[3] Suarez also indicates that he suffers from osteoarthritis. (Def. Mot. at 2.) But Suarez fails to explain how that diagnosis makes him particularly vulnerable to COVID-19. Accordingly, the Court concludes that this diagnosis does not present "extraordinary and compelling reasons" meriting compassionate release.

[4] Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions. html#obesity.

7

his BMI constitutes an "extraordinary and compelling reason." (Gov't Opp'n at 4–5.) Nevertheless, despite this change in guidance from the CDC, numerous courts in this Circuit have continued to hold that obesity – particularly where, as here, the movant's BMI is just barely above 30 – does not constitute "extraordinary and compelling" circumstances calling for relief. *See, e.g.*, *Gibson*, 2020 WL 7343802, at \*4; *Sturgis*, 2020 WL 7063359, at \*5; *United States v. Goldberg*, No. 13-cr-120 (JMA), 2020 WL 6273947, at \*3 (E.D.N.Y. Oct. 26, 2020) (collecting cases).

Ultimately, the Court is skeptical that the risk Suarez faces from COVID-19 constitutes an "extraordinary and compelling reason" warranting early release from custody. But even assuming that it does, Suarez's motion would still fail.

As the text of § 3582 makes clear, even if "extraordinary and compelling reasons" exist, a court cannot grant compassionate release without first considering the sentencing objectives embodied in § 3553(a). *See Broadus*, 2020 WL 3001040, at \*3. "In this context, the § 3553(a) factors provide a counterweight to 'extraordinary and compelling reasons' calling for a reduction of the defendant's sentence." *United States v. Musa*, --- F. Supp. 3d ---, 2020 WL 6873506, at \*5 (S.D.N.Y. 2020). "Put differently, the § 3553(a) factors are assessed to determine whether they 'outweigh the extraordinary and compelling reasons warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence.'" *Id.* (quoting *United States v. Ebbers*, 432 F. Supp. 3d 421, 430–31 (S.D.N.Y. 2020)).

Here, the section 3553(a) factors weigh strongly against granting Suarez compassionate release. In particular, (i) "the nature and circumstances of the offense," (ii) "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and (iii) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct," all outweigh any other facts that might otherwise support

Suarez's release.[5]  18 U.S.C. § 3553(a).  That is reason alone to deny Suarez's motion.  *See United States v. Rosa*, No. 11-cr-569 (PAC), 2020 WL 6075527, at *3 (S.D.N.Y. Oct. 15, 2020) (denying compassionate release despite the presence of "extraordinary and compelling reasons" because the § 3553(a) factors did not favor such relief); *United States v. Walter*, No. 18-cr-834 (PAE), 2020 WL 1892063, at *2–3 (S.D.N.Y Apr. 16, 2020) (same); *United States v. Butler*, No. 19-cr-834 (PAE), 2020 WL 1689778, at *2–3 (S.D.N.Y. Apr. 7, 2020) (same).

To state the obvious, transporting nearly a ton-and-a-half of cocaine through international waters "is an incredibly serious crime." (Sentencing Tr. at 9.)  In Suarez's case, his conduct was particularly egregious given his educational background and the fact that he was gainfully employed at the time he agreed to join the conspiracy. (*Id.* at 20–21, 29.)  So, far from reflecting an act of desperation, Suarez's conduct was "motivated by greed," with no consideration of "the impact [it would have] on other human beings." (*Id.* at 29.)

Suarez's post-arrest conduct only further demonstrates the need for a lengthy sentence. Not only did he refuse to accept responsibility for his actions, but he also attempted to obstruct justice on three separate occasions by lying under oath in an effort to "game the system" to avoid being held accountable for his conduct. (*Id.* at 27–28).  And while Suarez now attempts to minimize his culpability for his repeated perjury – suggesting that it was the result of his naiveté regarding U.S. law and his fear of going to prison (Reply at 7) – his excuses do not absolve him of the consequences of his actions. (*See, e.g.*, Sentencing Tr. at 17–18.)

Given these circumstances, the Court made clear that a sentence lower than 292 months would have been unwarranted. (*Id.* at 30–31.)  That remains just as true today as it was in 2018.

---

[5] Though certain of the other § 3553(a) factors are either neutral or slightly favor Suarez's release – for example, "the need for the sentence imposed . . . to provide [Suarez] with needed . . . medical care," 18 U.S.C. § 3553(a)(2) – they are far outweighed by the other considerations discussed herein.

9

*See United States v. Sherlock*, No. 17-cr-597 (RJS), 2020 WL 7263520, at *3 (S.D.N.Y. Dec. 10, 2020) (denying compassionate release where the "reasons for imposing [the original sentence] are just as applicable today as they were" at the time of sentencing). Consequently, releasing Suarez now, when he has served less than twenty percent of his sentence, would severely undermine the goals of sentencing. *See Butler*, 2020 WL 1689778, at *3 (drawing a contrast between a defendant who has served only one-fourth of his sentence and defendants who have served the "substantial majority of their sentences"). Indeed, other courts have denied compassionate release motions in similar circumstances. *See, e.g.*, *United States v. Johnson*, No. 16-cv-267 (VLB), 2020 WL 5369200, at *2, *6 (D. Conn. Sept. 8, 2020) (denying compassionate release because it would not "promote respect for the law" to grant early release to a defendant who obstructed justice and continually refused to take responsibility for his actions); *United States v. Serrano*, No. 13-cr-58 (AKH), 2020 WL 5259571, at *3–4 (S.D.N.Y. Sept. 3, 2020) (denying compassionate release because, among other reasons, the petitioner had served only "one-third" of his sentence, even though the petitioner was obese and had high cholesterol (among other medical ailments), and was housed at a facility where dozens of inmates had tested positive for COVID-19); *Broadus*, 2020 WL 3001040, at *3 (denying compassionate release even though the petitioner was obese and had "shown encouraging signs of rehabilitation," because, among other reasons, significantly reducing the term of the petitioner's sentence would "send the wrong message" (internal quotation marks omitted)).

Accordingly, even assuming that Suarez has demonstrated that "extraordinary and compelling reasons" favor his release during the pandemic, such relief would be inconsistent with the objectives of sentencing set forth in 18 U.S.C. § 3553(a). As a result, compassionate release is not warranted. *See Ebbers*, 432 F. Supp. 3d at 431.

10

## IV. Conclusion

For all these reasons, Suarez's motion for compassionate release is DENIED. The Clerk of Court is respectfully directed to mail a copy of this order to Suarez.

SO ORDERED.

Dated:      December 22, 2020
            New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

11