UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA


-v-


GERSON PELAGIO SUAREZ,

                Defendant.

---

No. 16-cr-453 (RJS)
<u>ORDER</u>

RICHARD J. SULLIVAN, Circuit Judge:

On May 2, 2024, Defendant Gerson Pelagio Suarez filed a motion for compassionate release pursuant to 18 U.S.C. §§ 3582(c)(1)(A) and (c)(2).  In support of that motion, he made reference to a variety of medical ailments and attached a copy of his compassionate release request to the Warden of FCI Fort Dix, which also contains personal medical information, and a 29-page addendum that includes an assortment of Defendant's personal medical records.  In light of the private medical information contained in this submission, the Court concludes that the presumption in favor of open records has been outweighed by Defendant's privacy interests.  *See United States v. Amodeo*, 71 F.3d 1044, 1048–51 (2d Cir. 1995).

Accordingly, IT IS HEREBY ORDERED THAT all references to that private medical information shall be redacted from Defendant's submission in advance of filing, as reflected in the attachment hereto, and that the 29-page addendum of medical records shall be filed under seal.  *See* Local Civil Rule 5.2, 2013 Committee Note (recommending that parties filing letters via ECF consider whether personal medical information should be in the public file); Local Criminal Rule 1.1 (applying Local Civil Rule 5.2 to criminal proceedings).

IT IS FURTHER ORDERED THAT the government shall file a letter by June 5, 2024 setting forth its position on Defendant's request.

The Clerk of Court is respectfully directed to docket this order and the redacted May 2, 2024 submission attached hereto and to mail a copy of this order to Defendant.

SO ORDERED.

Dated: May 22, 2024
New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

UNITED STATES DISTRICT COURT
for the Southern District of New York

UNITED STATES OF AMERICA,
    Respondent,

    v.                          Case No.: 16-cr-00453-2

GERSON P. SUAREZ,
    Petitioner, pro se.

Petition for Compassionate Release
Pursuant to §3582(c)(2)

I, Gerson P. Suarez (hereinafter Suarez or Petitioner) respectfully request compassionate release for the reasons discussed below.

## I. NEW DEFINITION(S) OF EXTRAORDINARY AND COMPELLING CIRCUMSTANCES FOR COMPASSIONATE RELEASE

On November 1, 2023 amended USSC Guidelines went into effect. Among the changes relevant here, the USSC expanded the definition of "extraordinary and compelling" to include §1B1.13(b)(1)(C):

> The defendant is suffering from a medical condition that requires long-term or specialized care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

The newly expanded Guideline §1B1.13 is the controlling legal standard when considering Motions pursuant to 18 U.S.C. §3582(c)(1)(A). 

The federal Bureau of Prisons, and

1

specifically the Health Services department at FCI Fort Dix has failed to provide the required standard of care to diagnose and treat such conditions.





Neutrophils.

These are specialized white blood cells that act as a person's first line of immuno-defense, according to the Cleveland Clinic. Information found on verywellhealth.com indicates that early stages of Leukemia, Lymphoma, or Myeloma cancer will cause low white blood cell counts, and lower levels of Neutrophils, a condition called Leukopenia.



According to the NIH, hemoglobin is a protein found in red blood cells that delivers oxygen to cells and removes carbon-dioxide. A proper level of hemoglobin is required to ensure the body's tissue receives proper oxygenation. According to the American Diabetes Association, adult males must maintain a hemoglobin level between 14-18 g/dL. See www.ada.com "Hemoglobin Levels".



█ ▐███████████████████████████████████

Chronic Lymphocytic Leukemia (CLL) is the most common type of Leukemia found in adults. CLL begins in the lymphocytes, a type of white blood cell. The American Cancer Society states that CLL builds up slowly, typically over a few years. Problematically, common symptoms, such as weakness, fatigue, weight loss, chills or fever, or swollen lymph nodes do not appear until the Leukemia cells have multiplied and spread from one's bone marrow to the bloodstream.

The American Cancer Society states early stage CLL, referred to as "Rai Stage" zero or 1 may only be recognized after blood tests reveal low levels of red blood cells (macrocytic Anemia), low white blood cell/Neutrophil count (Leukopenia) and reduced hemoglobin. These conditions often occur in combination in early-stage CLL just prior to the multiplication of Leukemia cells.

There are multiple tests a healthcare provider can use to determine whether a patient may have CLL. FCI Fort Dix Health Services has the ability to order these tests, which include a Complete Blood Count (CBC) with differential breakdown (meaning different types of red & white blood cells are identified), a Peripheral blood smear, and a Flow Cytometry test to identify the ZAP-70 and CD38 protein markers indicative of Leukemia. These three examples are the easiest and cheapest (as well as least invasive) initial tests that can be performed.

Doctors diagnose CLL based on the "Rai" system. According to the American Cancer Society, during Rai stage 0 no swelling of the lymph nodes, spleen, or liver needs to be present and red

5

blood cell counts are "near normal." It is not until Rai stage
three (3), considered high-risk, that red blood cell levels drop
to the macrocytic anemia level.

### E. Failure to Diagnose is Extraordinary and Compelling

Is it certain Petitioner has early-stage Chronic Lymphocytic
Leukemia? No. But the BOP, through FCI Fort Dix Health Services,
has a legal responsibility to provide the accepted standard of
medical care to protect Petitioner's current and future health.
See DeShaney v. Winnebago Cnty Dept. of Soc. Services, 489 US
189, 199-200 (1989) (Finding the government has a duty and
responsibility for the well-being of inmates); and Helling v.
McKinney, 509 US 25, 33 (1993) (finding prison officials must
protect the future health of inmates). Further, as a medical
professional, Dr. Ahmedi is expected to recognize certain
symptoms, conditions, or combinations of symptoms that may
indicate a serious medical issue even if she is not a specialist
in oncology.



Macrocytic Anemia and Leukopenia, █████████████████

███ ██ ████ █ ████████ ██ ███████  are conditions

6

that share one commonality: Leukemia or Lymphoma. Petitioner's family was able to discover this within 20-minutes of looking of his symptoms on reputable medical websites, no medical degree required. Yet Health Services, with their professional expertise, failed to recognize Petitioner's potential condition nor test for it.

Simple, non-invasive, and cheap tests are available to either rule out or provide more evidence of Chronic Lymphoma Leukemia. Yet Health Services took no further action.

Amended subpart 1B1.13(b)(1)(C) states extraordinary and compelling reasons warrant compassionate release if a petitioner requires specialized medical care, such as oncological care, that is not being provided. FCI Fort Dix Health services's failure to recognize that Petitioner's combined hemotological issues may indicate early Leukemia; their failure to order readily-available tests to explore that potential diagnosis, and ▮▮▮▮



all demonstrate that proper care is not being provided.

Nor can Petitioner place faith in the BOP's future ability to provide proper diagnosis or care given their failures he has experienced thus far.

### III. SUAREZ'S CONVICTION OF 46 U.S.C. §70503 NOW QUALIFIES FOR A SAFETY VALVE REDUCTION

The First Step Act of 2018 (Pub. L. No. 115-391, 132 Stat. 5194) expanded the number of crimes of conviction eligible for the so-called "Safety Valve" provision under §3553(f). The

government's sentencing memorandum, dated August 30, 2017, states, "...as both the Ninth and Eleventh Circuits have held, the plain language of §3553(f) extends safety valve eligibility to only certain offenses under Title 21, but does not do the same for Title 46 violations" (P. 7).

Since passage of the FSA, the above statement no longer is true. If Suarez was prosecuted today, rather than in 2017, his violation of 46 U.S.C. §70503 qualifies for Safety Valve relief pursuant to the requirements of §3553(f).

THE SAFETY VALVE PROVISION SHOULD BE APPLIED TO SUAREZ VIS A VIS HIS REQUEST FOR A REDUCTION OF SENTENCE IN LIGHT OF CREATED SENTENCING DISPARITIES POST-CONCEPCION

Though the First Step Act amended §3553(f) to include Suarez's crime of conviction, it also did something more: the new language prohibits the government from using information disclosed by a defendant as part of his proffer against him at sentencing. Specifically, the FSA reads, "Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense." Suarez would be more likely to engage in the requirements enumerated under §3553(f) now that such protections are in place. The changes to the Safety Valve create an unwarranted disparity between Suarez's sentence and the sentence a similar defendant would receive in 2022. This is on top of the sentence disparity he already received compared to defendants convicted of the same offense. Fixing that disparity is the responsibility of the courts under §3553(a), and courts within the Second Circuit and this district have used their authority

8

under §3582(c)(1)(A) to correct sentence disparities. Of
particular note is the Eastern District of New York's ruling in
United States v. Kissi, 460 F.Supp. 3d LEXIS 118956 (ED NY 2020),
finding "...that unwarranted disparity may in turn constitute an
extraordinary and compelling circumstance under section §3582(c).
The court further agrees...that had the First Step Act's
amendments to the Safety Valve provisions been in place at the
time Kissi was sentenced, he may indeed have fared better at
sentencing."

In reviewing section §3553(f), Suarez clearly meets the
requirements of subparts one through four. Argument hinges on
subpart five (5):

> (5) not later than the time of the sentencing
> hearing, the defendant has truthfully
> provided to the Government all information
> and evidence the defendant has concerning the
> offense or offenses that were part of the
> same course of conduct or of a common scheme
> or plan, but the fact that the defendant has
> no relevant or useful information to provide
> or that the Government is already aware of
> the information shall not preclude a
> determination by the court that the defendant
> has complied with this requirement.

The anticipated argument against application of the Safety
Valve provision to Suarez is the repeated mischaracterization
both by the government and court that Suarez committed perjury
and subsequently obstructed justice violating the Fifth prong of
§3553(f), "...he also attempted to obstruct justice on three
separate occasions by lying under oath..." (Order of Sullivan,
§3582(c)(1)(A) 12/22/20). The perjury is alleged to have occurred
during a duress hearing when Suarez testified he was under duress
during the transportation of the cocaine aboard The Sunshine; and

during a Fatico hearing when Suarez testified he was unaware of the cocaine until he was at sea.

The court and the government base their label of perjury (though no charge of perjury was ever filed) on the contradictory testimony of Suarez's co-defendant-turned-government-witness Richard Dow, a Canadian national. Dow was a longtime drug trafficker who organized the conspiracy to import the cocaine from Grenada to Canada. Dow was the captain of The Sunshine and leader of the conspiracy. Quickly realizing he would face more than 20-years in a foreign prison, Dow turned government witness and testified at the Fatico hearing.

In return, Dow received a sweetheart plea deal of 29-months (which coincidently is shorter than the time Suarez has spent in COVID-related lockdown) in prison, though with time served that sentence meant virtually no prison time.

The question then, as it pertains to the Safety Valve and §3553(f)(5) is whether it is actually "logical" or even legal to name Suarez a "perjurer" and claim he obstructed justice. For multiple reasons, the answer to this question is No.

Which scenario appears more logical: That Suarez, who has consistently maintained his version of events even after pleading guilty to his indictment with no security of a plea-deal, continues to perjure himself, throughout and beyond his sentencing; or, Richard Dow, fearful of spending 20-plus years in a foreign prison, contorted his testimony in whatever way he needed to (or the government needed him to) in order to secure a plea-deal that kept him virtually free and back to Canada in no

10

time? It is illogical that Suarez perjured himself, and continues to do so, after this Court sentenced him to 22.5 more years than Dow. It is illogical to presume Suarez committed perjury when he knew Dow had turned witness; it is illogical for Suarez to have perjured himself when he had already sealed his own fate by pleading guilty with an open-plea.

The court should not label Suarez a perjurer when his testimony does not meet the requirements for such a charge. In order to convict a defendant of perjury, the government or the court cannot use an oath against an oath. Originally, two witnesses were needed to contradict a sworn statement. Later, a lone witness (such as Richard Dow) could swear against the testimony of another so long as another witness, "swearing to circumstances bearing directly upon the imputed corpus delecti of the defendant was held sufficient." See Phair v. United States, citing United States v. Weiner, 479 F.2d 923 (2d Cir. 1973), "In prosecuting for perjury, a conviction may not be obtained solely on the uncorroborated oath of one witness."

The evidence submitted to support Dow's corrupted testimony does not rise to the legal standard of corroborated evidence. The Second Circuit has stated, "...the evidence [must be] 'of a quality to assure that a guilty verdict is solidly founded.'" See United States v. Goldberg, 290 F.2d 729, 734 (2d Cir. 1971) quoting United States v. Freedman, 445 F.2d 1220, 1971 US App. (2d Cir. 1961). In Weiler v. United States, 323 US at 610, 65 S.Ct. at 550, the High Court stated the corroborated evidence must be trustworthy. Appeals courts have interpreted this to mean

11

that the evidence must bear directly on and substantiate the testimony of the principle witness for the prosecution. See Goldberg, supra. In Phair, the court concluded, "probable or credible evidence is not enough. It must be strong and clear."

In alleging perjury the court claims Suarez testified he was under duress after learning the journey he had signed up for was a cocaine-run, and that fear for his safety prevented him from proactively contacting authorities. Other than Dow's testimony, the government offered no evidence that contradicted Suarez's state of mind, nor could anyone present "strong and clear" evidence to the emotions experienced at that time. If such evidence is absent, one should not be labelled a "perjurer."

Next, the government and court claimed Suarez lied when he testified he did not know he had loaded cocaine onto the boat prior to launch. To contradict this, the government entered into evidence photos of Dow and third co-defendant Stefan Van der End loading drugs on to The Sunshine. Dow was asked on cross whether he ever saw any surveillance photos showing Suarez loading drugs:

Q: Were you shown any photographs of Suarez doing the same?

A: No, I was never shown any of the photographs.

(Fatico hearing, 9/27/17; P. 134 Para. 20-21)

Dow confirmed Suarez loaded sail bags on The Sunshine:

Q: And the drugs were concealed?

A: They were concealed in sail bags so they did not look like drugs, and, yes, they were concealed.

Q: In sail bags.

A: In sail bags. So it just looked like plastic bags, sail bags.

12

(Fatico hearing, 9/27/17; P. 135 Para. 16-21).

The government also claimed Suarez had to know The Sunshine was to be loaded with drugs because he stayed in an apartment where drugs were stored. But according to Dow's testimony at the Fatico hearing:

> Q: And I understand your testimony to be that you never saw Mr. Suarez in that room ⌊where the drugs were held⌋. Is that correct?
>
> A: That is correct, sir, until -- yes, it is correct.
>
> (Fatico hearing, 9/27/17; P. 132 Para. 19-22).

In sum, Suarez claimed he was: (1) under duress once he discovered the true purpose of the trip; and (2) he had no prior knowledge of the true nature of the trip.

The government countered with Dow's self-serving testimony, photos of Dow and Van der End loading cocaine into The Sunshine, and photos of Suarez pushing a wheelbarrow and loading sail bags. The perjury standard requiring "strong and clear" evidence was not met here; nor did Dow's testimony impeach Suarez's assertions of duress or lack of knowledge. Perhaps this is why Suarez was never formally charged with perjury.

Next, even if the court were to continue to believe and insist on the allegations of perjury, the allegation "⌊can⌋ not be predicated on false testimony as to immaterial matter." See United States v. Perdue, 4. 897 (D. PA 1880); Ammerman v. United States, 185 F.1 (8th Cir. 1911); Morris v. United States, 216 F.175 (7th Cir. 1919); and Hill v. United States, 54 F.2d 599

13

(10th Cir. 1931). Immaterial means, "unimportant; without weight or significance," while immaterial evidence is defined as, "a claim or proof which has no legal bearing on the point at issue," according to the Law Dictionary. Suarez's conviction on 46 U.S.C. §70503, and his subsequent guilty plea, do not hinge on whether he was under duress or whether he knew prior to launch that drugs' were aboard The Sunshine. Suarez was detained by the US Coast Guard aboard a boat carrying approximately 400-650 kilos of cocaine destined for Canada. Those facts are indisputable, those are the facts that Suarez allocated to, and those are the only facts that matter.

The Second Circuit determined in United States v. Schreiber, when the defendant lied at least four times in pre-sentence conversations with the government, that the defendant was not disqualified from receiving a Safety Valve reduction because he allocuted his complete knowledge of material facts prior to sentencing.

Therefore, between precedent established in Kissi, supra., and Schreiber, Id., and the lack of strong and clear evidence supporting any allegation of perjury, Suarez should qualify, were he sentenced today, for the expanded (and newly protected) Safety Valve reduction under the First Step Act. As determined within this Circuit, sentence disparity created by legal reforms warrant extraordinary and compelling reasons for a reduction of sentence. The Supreme Court's decision in Concepcion, that Section 404 of the First Step Act may be considered as part of the complex of circumstances when evaluating for compassionate release, should

14

guide this Court's retroactive application of the new Safety Valve provisions established in the FSA.

## IV. RETROACTIVE CHANGES TO USSG §4C1.1 NOW SUPPORT A REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. §3582(C)(2)

### A. Change to the Guidelines

In May 2023, after finally being reconstituted with a full quorum of members, the US Sentencing Commission promulgated amendments and updates to the Sentencing Guidelines. Those updates took effect on November 1, 2023. Most are technical or mere textual updates and revisions. A notable few, however, are substantive and designed to bring needed relief.

One of the substantive changes, later made retroactive, is relevant here. After much study, it is now clear that criminal defendants who score zero criminal history points recidivate at a significantly lower rate than those who score any criminal history points under USSG §4. See www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Armed with this knowledge, the Commission created what is essentially a new criminal history category for these "zero-point offenders".

Under the new §4C1.1, a qualifying defendant would have 2-levels reduced from his total offense level. For some defendants this would equate to a reduction of up to 30 months or more. But not every defendant with zero criminal history points qualifies for this reduction. The Commission carved out 9 subsets of offenders from this new benefit including (among others) sex offenders, terrorists, those who possessed a firearm or other deadly weapon, and human rights violators. See new §4C1.1(a)(2)-(10).

15

Ultimately, this retroactive change will affect thousands of inmates throughout the federal system. More importantly, it reflects a more nuanced and contemporary understanding of who needs a lengthy sentence and who does not. Based on the following, it is clear Petitioner is one who does not.

B. Legal Standard

Under §3582(c)(2), an inmate may petition the court for a reduction of his sentence if he was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission". This authority extends only to those amendments listed in §1B1.10(d). See United States v. Caceda, 990 F.2d 707, 710 (2nd Cir, 1993). See also United States v. King, 813 Fed. Appx 690, 693 (2nd Cir, 2020). Much like a motion made under the "compassionate release" portion of this statute found at subsection (c)(1), courts engage in a two-step inquiry. United States v. Deandrade, 2020 US Dist. LEXIS 82553 at *5-6 (SDNY, 5/11/20) (collecting cases). The inmate must first demonstrate he would have been eligible for a lower sentence if the amended guideline range had been in effect at the time of his original sentence. See Dillon v. United States, 560 US 817, 826 (2010). If the answer to that first inquiry is affirmative, the court may determine whether a reduction is appropriate after considering the factors found at §3553(a). United States v. Mock, 612 F.3d 133, 134 (2nd Cir, 2010). The court may make additional findings of fact so long as they are consistent with factual determinations made at sentencing. United States v. Rios, 765 F.3d 133, 138 (2nd Cir, 2014).

16

### C. Petitioner Qualifies for a Reduction Under USSG §4C1.1

Petitioner is a Qualifying Inmate: A careful review of Petitioner's underlying sentence and applicable Guidelines range demonstrates he qualifies for a reduction under §3582(c)(2) based upon the newly amended §4C1.1.

First, Petitioner was not convicted of any sort of disqualifying offense. He was not given any sort of adjustment related to terroristic activities under §4A1.4. See §4C1.1(a)(2). No violence or credible threats or violence were part of this offense. §4C1.1(a)(3). Nobody died as a result of his offense, §4C1.1(a)(4), nor was he convicted of any kind of sex offense. §4C1.1(a)(5). Petitioner did not cause any kind of financial hardship, §4C1.1(a)(6), and he never possessed any kind of weapon. §4C1.1(a)(7). No adjustment was given for violating individual or human rights. §4C1.1(a)(8) & (9). Petitioner was also not engaged in any sort of continuing criminal enterprise. §4C1.1(a)(10). Therefore, none of the disqualifying factors under §4C1.1(a) apply to Petitioner.

Second, Petitioner's Guideline range changes with the application of §4C1.1. He was awarded no criminal history points under Chapter 4 of the guidelines. Petitioner was sentenced at Category I, Offense Level 40 representing a guideline range of 292-365 months. This Court sentenced Petitioner to the bottom of the guideline range at 292 months. Applying amended §4C1.1 now results in a sentence equivalent to Category I, total offense level 38 representing 235-293 months. Therefore, Petitioner has demonstrated he qualifies for a reduction pursuant to

17

§3582(c)(2).

## V. FACTORS SET FORTH UNDER 18 U.S.C. §3553(a) CONTINUE TO SUPPORT PETITIONER'S REQUEST FOR A REDUCTION OF SENTENCE

Petitioner asserts §3553(a) factors support this request. Petitioner is not a danger to the American public. He has no prior criminal record, no history of violence, or deviant behavior. He will be deported upon release, further safeguarding the public.

The Government evaluated Petitioner's criminal conduct and determined a 60-month sentence appropriate as specified in their original plea offer. Petitioner's 292-month sentence represents a gross disparity between what the government thought appropriate and what was given. Petitioner has now served over 7-years in prison, a period of incarceration that respects the law, provides deterrence, and represents just punishment relative to comparable defendants in the Southern District of New York.

### A. §3553(a)(1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Lets examine the nature of Suarez's instant offense: Suarez, along with co-defendants Van der End and Dow, were interdicted by the US Coast Guard in international waters. Upon boarding, the Coast Guard found and confiscated between 400-650 kilos of cocaine destined to Dow's home country of Canada. No direct-nexus between the actions of Suarez or the United States has ever been established.

Next, lets examine Suarez's history and characteristics. Suarez is an educated man with no prior criminal history who was gainfully and legally employed at the time he agreed to work on

18

Dow's boat. He has no history of violence or other behaviors that would lead anyone to characterize him as deviant. There is no evidence he was in a leadership or organizer's role in the instant offense as the government's own investigation labelled Dow and Van der End in those roles. Further, Suarez was only asked to work on Dow's boat as the cook after Dow rejected the conspirator's first choice.

The nature of the crime and Suarez's history and characteristics hardly combine to warrant a punishment of 24.5 years in a foreign prison.

Next, lets compare Suarez's crime to those of other criminal defendants within the Southern District who not only were granted §3582(c)(1)(A) relief, but were given immediate release. First, in United States v. Rodriguez, supra., defendant Rodriguez was granted immediate compassionate release despite his criminal history, his character, and the nature of his offense: He received a life sentence after participating in a murder, yet the Southern District of New York determined, "... the pandemic ... has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case." The pandemic trumped murder.

Then there is United States v. Reiter, supra., where the defendant was convicted for RICO violations, possessing and distributing heroin, and three drug-related murders. His personal history and character make Rodriguez appear to be an angel, and he was sentenced to two life sentences plus another 60-years once those life sentences ended. Again, the Southern District of New York found the pandemic created conditions of incarceration more

19

harsh than Reiter's life sentence foretold and released him on compassionate release.

The point here is twofold: First, in comparing Suarez to other criminal defendants, one cannot claim his instant offense is too egregious to be given a reduction of sentence. Suarez, a first-time, non-violent offender pled guilty of possessing cocaine with intent to distribute. He was traveling in international waters with no proven direct-nexus between his actions and the United States. To claim he cannot satisfy §3553(a)(1) cannot be rational. Second, our justice system is based upon the foundational concepts of jurisprudence, or binding case law. For this court to claim Suarez's crime or character disqualifies him from a reduction of sentence when this district has granted immediate release to murderers serving life would undermine that foundational concept.

When returned to Curaçoa, Suarez will be the primary caregiver for his 85-year old father who currently needs help with basic life-functions after the passing of Suarez's mother. His character and history suggest Suarez will be a loving, attentive son as he was throughout the course of his life.

B. §3553(a)(2)(A), (B), (D), and §3553(a)(4): To Reflect the Seriousness of the Offense to Promote Respect for the Law, to Provide Just Punishment for the Offense; to Afford Adequate Deterrence to Criminal Conduct; to Provide the Defendant with Needed Educational or Vocational Training ... and to Consider the Kinds of Sentence and Sentencing Range

The Government initially offered a plea agreement of 60-months incarceration for Suarez's guilty plea. Suarez rejected that offer because his lawyer did not explain the sentence

disparity that would result from losing at trial. Suarez also did not believe he was guilty as charged. After numerous enhancements, the government recommended a sentence guideline range of 292-365 months imprisonment. One purpose of §3553(a) is to ensure criminal sentences are not greater or more severe than necessary. The discrepancy between 60-months and the 292-months this Court sentenced Suarez to serve cannot be easily explained. Suarez's alleged crime had not changed; his involvement remained the same. Prior to his eventual plea, the government believed a 5-year sentence fulfilled the requirements of §3553(a). Logically, if five-years in prison is a punishment that equals the crime, 24.5 years in prison for the same crime must represent a sentence greater than necessary. There cannot be two standards, or two versions of §3553(a): One that requires a five-year sentence one month, and a 24.5 year sentence several months later. Nor does Suarez's 292-months in a foreign prison correspond to the overwhelming number of similar cases decided by the Southern District of New York between 2016-2017, the year Suarez was sentenced. Simply, Suarez's original sentence created the type of sentence disparity §3553(a) was put in place to prevent.

Subsequently, a reduction in sentence under §3582(c)(1)(A) cannot violate the factors outlined in §3553(A)(2)(A) and (B). Reducing Suarez's sentence would, in actuality, properly restore the spirit of §3553(a). Suarez has maintained prison employment when able, and participated in prison-sponsored programming. He was locked in his housing unit or on modified operations for 30-

months and forced to work next to COVID-positive staff for 15-hour days on the prison's East side. He was assaulted by another inmate, placed in disciplinary housing, and recontracted COVID there. Now he potentially has ██ ████ ████ ██ ████ and qualifies for the retroactive application of the amended sentencing guidelines.

### C. §3553(a)(2)(C): To Protect the Public From further Crimes of the Defendant

The American public will be protected from any "future crimes" committed by Suarez because, upon release, he will be deported to the Netherlands or Curacao. In deciding other §3582(c)(1)(A) requests, the Southern district has determined deportation is a consideration in favor of granting a reduction of sentence. See United States v. Francis, No. 06-cr-0080 LEXIS 13272 (SD NY 2021), stating, "The Court is likewise satisfied that defendant will not pose a danger to any persons or to the community [because the] defendant is subject to an ICE detainer." See also United States v. Hernandez-Frometa, No. 18-cr-0660 LEXIS 193073 (SD NY 2020).

It is unlikely, given Suarez's experience within the United States' legal system, that he would try to re-enter this country. See United States v. Ledezma-Rodriguez, 472 F.Supp. 3d 498 (SD IA 2020) where the government/ICE can fast track transfer back to one's home country.

### D. §3553(a)(6): To Prevent Unwarranted Sentence Disparities

As shown herein, a reduction in Suarez's sentence would actually rectify an unwarranted sentence disparity of 24.5 years in prison. Combined with the disparity that now exists due to

22

expansion of 46 U.S.C. §70503 under §3553(f), a sentence reduction would rectify an existing injustice, not create one.

Furthermore, Suarez's indicted co-defendant, Richard Dow, the mastermind of the enterprise, who had a history of drug trafficking, who owned the boat, who organized the venture, and who hired Suarez, received a 29-month sentence because he told US authorities what they already knew and had determined as part of their investigation. The organizer and leader, Dow, testified to whatever the government requested of him to secure a two-year five-month sentence (minus his time-served awaiting sentencing) to avoid a 24.5 year sentence. How can it be justice for Dow to serve 22 less years in prison simply because he testified at a Fatico hearing? The leader of the crime does 22 less years than Suarez, the very last person added to the conspiracy at the very last minute who had never previously met Dow and had never previously committed a crime. That is an injustice in violation of the §3553(a).

Due to changes of law, Suarez, were he to be sentenced today, could benefit from the Safety Valve reduction under §3553(f). Such a change creates a sentence disparity that this Court, post-Concepcion, may remedy. Having shown that no statements or actions violated the five requirements enumerated within §3553(f), Suarez asks this Court to recognize an unwarranted sentence disparity.

23

## VI. CONCLUSION

Petitioner asserts he qualifies for a reduction of sentence under §3582(c)(2). He meets all of the criteria under the new USSG §4C1.1. All of the sentencing factors militate in favor of this reduction. He is precisely the kind of inmate the US Sentencing Commission now recognizes no longer requires a lengthy sentence as once believed. Granting this request would be an appropriate use of judicial discretion. However, Petitioner also exemplifies at-risk inmates amended guideline 1B1.13 is meant to help.

Petitioner also qualifies for compassionate release under the USSG §1B1.13(b)(1)(C) pursuant to §3582(c)(1)(A) due to FCI Fort Dix's inadequate medical care. He has demonstrated the relevant sentencing factors enumerated in 18 U.S.C. §3553(a) have been met to allow compassionate release.

WHEREFORE all of the above reasons, Petitioner requests this Court grant his request for compassionate release, or, in the alternative, a reduction in sentence to 120-months as recommended by Petitioner's PSR.

Respectfully submitted,

Dated May  2 , 2024

Gerson P. Suarez
Reg. No. 75878-054
FCI-Fort Dix
PO Box 2000
Joint Base MDL, NJ  08640

24

Certificate of Service

I, Gerson Suarez, do hereby certify that on this 2Nd day of
May, 2024 I did serve a true and accurate copy of the attached
Petition for Compassionate Release on Respondent at One St.
Andrew's Plaza, New York, NY 10007 via the official Inmate Legal
Mail system, First Class US Mail, postage pre-paid.

Gerson Suarez

Petitioner's Written Request
to the FCI-Fort Dix Warden

Request for Compassionate Release
To The Warden of FCI Fort Dix
December 27, 2023

Submitted by Gerson P. Suarez
Building 5802; 75878-054

I, Gerson P. Suarez (hereinafter Suarez or Petitioner) respectfully request compassionate release for the reasons discussed below.

## I. NEW DEFINITION(S) OF EXTRAORDINARY AND COMPELLING CIRCUMSTANCES FOR COMPASSIONATE RELEASE

On November 1, 2023 amended USSC Guidelines went into effect. Among the changes relevant here, the USSC expanded the definition of "extraordinary and compelling" to include §1B1.13(b)(1)(C):

> The defendant is suffering from a medical condition that requires long-term or specialized care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

The newly expanded Guideline 1B1.13 is the controlling legal standard when considering Motions pursuant to 18 U.S.C. §3582(c)(1)(A). The federal Bureau of Prisons, and specifically the Health Services department at FCI Fort Dix has failed to provide the required standard of care to diagnose and treat such conditions.



1



Neutrophils. These are specialized white blood cells that act as a person's first

line of immuno-defense, according to the Cleveland Clinic. Information found on verywellhealth.com indicates that early stages of Leukemia, Lymphoma, or Myleloma cancer will cause low white blood cell counts, and lower levels of Neutrophils, a condition called Leukopenia.



According to the NIH, hemoglobin is a protein found in red blood cells that delivers oxygen to cells and removes carbon-dioxide. A proper level of hemoglobin is required to ensure the body's tissue receives proper oxygenation. According to the American Diabetes Association, adult males must maintain a hemoglobin level between 14-18 g/dL. See www.ada.com "Hemoglobin Levels".



Chronic Lymphocytic Leukemia (CLL) is the most common type of Leukemia found in adults. CLL begins in the lymphocytes, a type of white blood cell. The American Cancer Society states that CLL builds up slowly, typically over a few years. Problematically, common symptoms, such as weakness, fatigue, weight loss, chills or fever, or swollen lymph nodes do not appear until the Leukemia cells have multiplied and spread from one's bone marrow to the bloodstream.

The American Cancer Society states early stage CLL, referred to as "Rai stage" zero or 1 may only be recognized after blood tests reveal low levels of red blood cells (macrocytic Anemia), low white blood cell/Neutrophil count (Leukopenia) and reduced hemoglobin. These conditions often occur in combination in early-stage CLL just prior to the multiplication of Leukemia cells.

There are multiple tests a healthcare provider can use to determine whether a patient may have CLL. FCI Fort Dix Health Services has the ability to order these test, which include a Complete Blood Count (CBC) with differential breakdown (meaning different types of red & white blood cells are identified), a Peripheral blood smear, and a Flow Cytometry test to identify the ZAP-70 and CD38 protein markers indicative of Leukemia. These

3

three examples are the easiest and cheapest (as well as least invasive) initial tests that can be performed.

Doctors diagnose CLL based on the "Rai" system. According to the American Cancer Society, during Rai stage 0 no swelling of the lymph nodes, spleen, or liver needs to be present and red blood cell counts are "near normal." It is not until Rai stage three (3), considered high-risk, that red blood cell levels drop to the macrocytic anemia level.

### E. Failure to Diagnose is Extraordinary and Compelling

Is it certain Petitioner has early-stage Chronic Lymphocytic Leukemia? No. But the BOP, through FCI Fort Dix Health Services, has a legal responsibility to provide the accepted standard of medical care to protect Petitioner's current and future health. See DeShaney v. Winnebago Cnty Dept. of Soc. Services, 489 US 189, 199-200 (1989) (Finding the government has a duty and responsibility for the well-being of inmates); and Helling v. McKinney, 509 US 25, 33 (1993) (finding prison officials must protect the future health of inmates). Further, as a medical professional, Dr. Ahmedi is expected to recognize certain symptoms, conditions, or combinations of symptoms that may indicate a serious medical issue even if she is not a specialist in oncology.



Macrocytic Anemia and Leukopenia. ███████ ███████ are conditions that share one commonality: Leukemia or Lymphoma. Petitioner's family was able to discover this within 20-minutes of looking up his symptoms on reputable medical websites, no medical degree required. Yet Health Services, with their professional expertise, failed to recognize Petitioner's potential condition nor test for it.

And simple, non-invasive, cheap tests are available to either rule out or provide more evidence of Chronic Lymphoma Leukemia. Yet Health Services took no further action.

Amended subpart 1B1.13(b)(1)(C) states extraordinary and compelling reasons warrant compassionate release if a petitioner requires specialized medical care, such as oncological care, that is not being provided. FCI Fort Dix Health Service's failure to recognize that Petitioner's combined hemotological issues may

4

indicate early Leukemia; their failure to order readily-available tests to explore that potential diagnosis. ███████ ████████████████████████████ all demonstrate that proper care is not being provided.

Nor can Petitioner place faith in the BOP's future ability to provide proper diagnosis or care given their failures he has experienced thus far.

### III. SUAREZ'S CONVICTION OF 46 U.S.C. §70503 NOW QUALIFIES FOR A SAFETY VALVE REDUCTION

The First Step Act of 2018 (Pub. L. No. 115-391, 132 Stat. 5194) expanded the number of crimes of conviction eligible for the so-called "Safety Valve" provision under §3553(f). The government's sentencing memorandum, dated August 30, 2017, states, "...as both the Ninth and Eleventh Circuits have held, the plain language of §3553(f) extends safety valve eligibility to only certain offenses under Title 21, but does not do the same for Title 46 violations" (P. 7).

Since passage of the FSA, the above statement no longer is true. If Suarez was prosecuted today, rather than in 2017, his violation of 46 U.S.C. §70503 qualifies for Safety Valve relief pursuant to the requirements of §3553(f).

THE SAFETY VALVE PROVISION SHOULD BE APPLIED TO SUAREZ VIS A VIS HIS REQUEST FOR A REDUCTION OF SENTENCE IN LIGHT OF CREATED SENTENCING DISPARITIES POST-CONCEPCION

Though the First Step Act amended §3553(f) to include Suarez's crime of conviction, it also did something more: the new language prohibits the government from using information disclosed by a defendant as part of his proffer against him at sentencing. Specifically, the FSA reads, "Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense." Suarez would be more likely to engage in the requirements enumerated under §3553(f) now that such protections are in place. The changes to the Safety Valve create an unwarranted disparity between Suarez's sentence and the sentence a similar defendant would receive in 2022. This is on top of the sentence disparity he already received compared to defendants convicted of the same offense. Fixing that disparity is the responsibility of the courts under §3553(a), and courts within the Second Circuit and this district have used their authority under §3582(c)(1)(A) to correct sentence disparities. Of particular note is the Eastern District of New York's ruling in United States v. Kissi, 460 F.Supp. 3d LEXIS 118956 (ED NY 2020), finding "...that unwarranted disparity may in turn constitute an extraordinary and compelling circumstance under section §3582(c). The court further agrees...that had the First Step Act's

amendments to the Safety Valve provisions been in place at the time Kissi was sentenced, he may indeed have fared better at sentencing."

In reviewing section §3553(f), Suarez clearly meets the requirements of subparts one through four. Argument hinges on subpart five (5):

> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

The anticipated argument against application of the Safety Valve provision to Suarez is the repeated mischaracterization both by the government and court that Suarez committed perjury and subsequently obstructed justice violating the Fifth prong of §3553(f), "...he also attempted to obstruct justice on three separate occasions by lying under oath..." (Order of Sullivan, §3582(c)(1)(A) 12/22/20). The perjury is alleged to have occurred during a duress hearing when Suarez testified he was under duress during the transportation of the cocaine aboard The Sunshine; and during a Fatico hearing when Suarez testified he was unaware of the cocaine until he was at sea.

The court and the government base their label of perjury (though no charge of perjury was ever filed) on the contradictory testimony of Suarez's co-defendant turned government witness Richard Dow, a Canadian national. Dow was a longtime drug trafficker who organized the conspiracy to import the cocaine from Grenada to Canada. Dow was the captain of The Sunshine and leader of the conspiracy. Quickly realizing he would face more than 20-years in a foreign prison, Dow turned government witness and testified at the Fatico hearing.

In return, Dow received a sweetheart plea deal of 29-months (which coincidently is shorter than the time Suarez has spent in COVID-related lockdown) in prison, though with time served that sentence meant virtually no prison time.

The question then, as it pertains to the Safety Valve and §3553(f)(5) is whether it is actually "logical" or even legal to name Suarez a "perjurer" and claim he obstructed justice. For multiple reasons, the answer to this question is No.

Which scenario appears more logical: That Suarez, who has

consistently maintained his version of events even after pleading guilty to his indictment with no security of a plea-deal, continues to perjure himself, throughout and beyond his sentencing; or, Richard Dow, fearful of spending 20-plus years in a foreign prison, contorted his testimony in whatever way he needed to (or the government needed him to) in order to secure a plea-deal that kept him virtually free and back to Canada in no time? It is illogical that Suarez perjured himself, and continues to do so, after this Court sentenced him to 22.5 more years than Dow. It is illogical to presume Suarez committed perjury when he knew Dow had turned witness; it is illogical for Suarez to have perjured himself when he had already sealed his own fate by pleading guilty with an open-plea.

The court should not label Suarez a perjurer when his testimony does not meet the requirements for such a charge. In order to convict a defendant of perjury, the government or the court cannot use an oath against an oath. Originally, two witnesses were needed to contradict a sworn statement. Later, a lone witness (such as Richard Dow) could swear against the testimony of another so long as another witness, "swearing to circumstances bearing directly upon the imputed corpus delicti of the defendant was held sufficient." See Phair v. United States, citing United States v. Weiner, 479 F.2d 923 (2d Cir. 1973), "In prosecuting for perjury, a conviction may not be obtained solely on the uncorroborated oath of one witness."

The evidence submitted to support Dow's corrupted testimony does not rise to the legal standard of corroborated evidence. The Second Circuit has stated, "...the evidence ⌊must be⌋ 'of a quality to assure that a guilty verdict is solidly founded.'" See United States v. Goldberg, 290 F.2d 729, 734 (2d Cir. 1971) quoting United States v. Freedman, 445 F.2d 1220, 1971 US App. (2d Cir. 1961). In Wieler V. United States, 323 US at 610, 65 S.Ct. at 550, the High Court stated the corroborated evidence must be trustworthy. Appeals courts have interpreted this to mean that the evidence must bear directly on and substantiate the testimony of the principle witness for the prosecution. See Goldberg, supra. In Phair, the court concluded, "probable or credible evidence is not enough. It must be strong and clear."

In alleging perjury the court claims Suarez testified he was under duress after learning the journey he had signed up for was a cocaine-run, and that fear for his safety prevented him from proactively contacting authorities. Other than Dow's testimony, the government offered no evidence that contradicted Suarez's state of mind, nor could anyone present "strong and clear" evidence to the emotions experienced at that time. If such evidence is absent, one should not be labelled "perjurer."

Next, the government and court claimed Suarez lied when he testified he did not know he had loaded cocaine onto the boat prior to launch. To contradict this, the government entered into evidence photos of Dow and third co-defendant Stefan Van der End

loading drugs on to The Sunshine. Dow was asked on cross whether he ever saw any surveillance photos showing Suarez loading drugs:

Q: Were you shown any photographs of Suarez doing the same?

A: No, I was never shown any of the photographs.

(Fatico hearing, 9/27/17; P. 134 Para. 20-21)

Dow confirmed Suarez loaded sail bags on The Sunshine:

Q: And the drugs were concealed?

A: They were concealed in sail bags so they did not look like drugs, and, yes, they were concealed.

Q: In sail bags.

A: In sail bags. So it just looked like plastic bags, sail bags.

(Fatico hearing, 9/27/17; P. 135 Para. 16-21).

The government also claimed Suarez had to know The Sunshine was to be loaded with drugs because he stayed in an apartment where drugs were stored. But according to Dow's testimony at the Fatico hearing:

Q: And I understand your testimony to be that you never saw Mr. Suarez in that room [where the drugs were held]. Is that correct?

A: That is correct, sir, until -- yes, it is correct.

(Fatico hearing, 9/27/17; P. 132 Para. 19-22).

In sum, Suarez claimed he was: (1) under duress once he discovered the true purpose of the trip; and (2) he had no prior knowledge of the true nature of the trip.

The government countered with Dow's self-serving testimony, photos of Dow and Van der End loading cocaine into The Sunshine, and photos of Suarez pushing a wheelbarrow and loading sail bags. The perjury standard requiring "strong and clear" evidence was not met here; nor did Dow's testimony impeach Suarez's assertions of duress or lack of knowledge. Perhaps this is why Suarez was never formally charged with perjury.

Next, even if the court were to continue to believe and insist on the allegations of perjury, the allegation "[can] not be predicated on false testimony as to immaterial matter." See United States v. Perdue, 4. 897 (D. PA 1880); Ammerman v. United States, 185 F.1 (8th Cir. 1911); Morris v. United States, 216 F.175 (7th Cir. 1919); and Hill v. United States, 54 F.2d 599

(10th Cir. 1931). Immaterial means, "unimportant; without #eight or significance," while immaterial evidence is defined as, "a claim or proof which has no legal bearing on the point at issue," according to the Law Dictionary. Suarez's conviction on 46 U.S.C. §70503, and his subsequent guilty plea, do not hinge on whether he was under duress or whether he knew prior to launch that drugs' were aboard The Sunshine. Suarez was detained by the US Coast Guard aboard a boat carrying approximately 400-650 kilos of cocaine destined for Canada. Those facts are indisputable, those are the facts that Suarez allocated to, and those are the only facts that matter.

The Second Circuit determined in United States v. Schreiber, when the defendant lied at least four times in pre-sentence conversations with the government, that the defendant was not disqualified from receiving a Safety Valve reduction because he allocuted his complete knowledge of material facts prior to sentencing.

Therefore, between precedent established in Kissi, supra., and Schreiber, Id., and the lack of strong and clear evidence supporting any allegation of perjury, Suarez should qualify, were he sentenced today, for the expanded (and newly protected) Safety Valve reduction under the First Step Act. As determined within this Circuit, sentence disparity created by legal reforms warrant extraordinary and compelling reasons for a reduction of sentence. The Supreme Court's decision in Concepcion, that Section 404 of the First Step Act may be considered as part of the complex of circumstances when evaluating for compassionate release, should guide this Court's retroactive application of the new Safety Valve provisions established in the FSA.

### IV. RETROACTIVE CHANGES TO USSG §4C1.1 NOW SUPPORT A REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. §3582(C)(2)

A. Change to the Guidelines

In May 2023, after finally being reconstituted with a full quorum of members, the US Sentencing Commission promulgated amendments and updates to the Sentencing Guidelines. Those updates took effect on November 1, 2023. Most are technical or mere textual updates and revisions. A notable few, however, are substantive and designed to bring needed relief.

One of the substantive changes, later made retroactive, is relevant here. After much study, it is now clear that criminal defendants who score zero criminal history points recidivate at a significantly lower rate than those who score any criminal history points under USSG §4. See www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Armed with this knowledge, the Commission created what is essentially a new criminal history category for these "zero-point offenders".

Under the new §4C1.1, a qualifying defendant would have 2-levels

reduced from his total offense level. For some defendants this would equate to a reduction of up to 30 months or more. But not every defendant with zero criminal history points qualifies for this reduction. The Commission carved out 9 subsets of offenders from this new benefit including (among others) sex offenders, terrorists, those who possessed a firearm or other deadly weapon, and human rights violators. See new §4C1.1(a)(2)-(10).

Ultimately, this retroactive change will affect thousands of inmates throughout the federal system. More importantly, it reflects a more nuanced and contemporary understanding of who needs a lengthy sentence and who does not. Based on the following, it is clear Petitioner is one who does not.

### B. Legal Standard

Under §3582(c)(2), an inmate may petition the court for a reduction of his sentence if he was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission". This authority extends only to those amendments listed in §1B1.10(d). See United States v. Caceda, 990 F.2d 707, 710 (2nd Cir, 1993). See also United States v. King, 813 Fed. Appx 690, 693 (2nd Cir, 2020). Much like a motion made under the "compassionate release" portion of this statute found at subsection (c)(1), courts engage in a two-step inquiry. United States v. Deandrade, 2020 US Dist. LEXIS 82553 at *5-6 (SDNY, 5/11/20) (collecting cases). The inmate must first demonstrate he would have been eligible for a lower sentence if the amended guideline range had been in effect at the time of his original sentence. See Dillon v. United States, 560 US 817, 826 (2010). If the answer to that first inquiry is affirmative, the court may determine whether a reduction is appropriate after considering the factors found at §3553(a). United States v. Mock, 612 F.3d 133, 134 (2nd Cir, 2010). The court may make additional findings of fact so long as they are consistent with factual determinations made at sentencing. United States v. Rios, 765 F.3d 133, 138 (2nd Cir, 2014).

### C. Petitioner Qualifies for a Reduction Under USSG §4C1.1

Petitioner is a Qualifying Inmate: A careful review of Petitioner's underlying sentence and applicable Guidelines range demonstrates he qualifies for a reduction under §3582(c)(2) based upon the newly amended §4C1.1.

First, Petitioner was not convicted of any sort of disqualifying offense. He was not given any sort of adjustment related to terroristic activities under §4A1.4. See §4C1.1(a)(2). No violence or credible threats or violence were part of this offense. §4C1.1(a)(3). Nobody died as a result of his offense, §4C1.1(a)(4), nor was he convicted of any kind of sex offense. §4C1.1(a)(5). Petitioner did not cause any kind of financial hardship, §4C1.1(a)(6), and he never possessed any kind of weapon. §4C1.1(a)(7). No adjustment was given for violating

individual or human rights. §4C1.1(a)(8) & (9). Petitioner was also not engaged in any sort of continuing criminal enterprise. §4C1.1(a)(10). Therefore, none of the disqualifying factors under §4C1.1(a) apply to Petitioner.

Second, Petitioner's Guideline range changes with the application of §4C1.1. He was awarded no criminal history points under Chapter 4 of the guidelines. Petitioner was sentenced at Category I, Offense Level 40 representing a guideline range of 292-365 months. This Court sentenced Petitioner to the bottom of the guideline range at 292 months. Applying amended §4C1.1 now results in a sentence equivalent to Category I, total offense level 38 representing 235-293 months. Therefore, Petitioner has demonstrated he qualifies for a reduction pursuant to §3582(c)(2).

## V. FACTORS SET FORTH UNDER 18 U.S.C. §3553(a) CONTINUE TO SUPPORT PETITIONER'S REQUEST FOR A REDUCTION OF SENTENCE

Petitioner asserts §3553(a) factors support this request. Petitioner is not a danger to the American public. He has no prior criminal record, no history of violence, or deviant behavior. He will be deported upon release, further safeguarding the public.

The Government evaluated Petitioner's criminal conduct and determined a 60-month sentence appropriate as specified in their original plea offer. Petitioner's 292-month sentence represents a gross disparity between what the government thought appropriate and what was given. Petitioner has now served over 7-years in prison, a period of incarceration that respects the law, provides deterrence, and represents just punishment relative to comparable defendants in the Southern District of New York.

### A. §3553(a)(1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Lets examine the nature of Suarez's instant offense: Suarez, along with co-defendants Van der End and Dow, were interdicted by the US Coast Guard in international waters. Upon boarding, the Coast Guard found and confiscated between 400-650 kilos of cocaine destined to Dow's home country of Canada. No direct-nexus between the actions of Suarez or the United States has ever been established.

Next, lets examine Suarez's history and characteristics. Suarez is an educated man with no prior criminal history who was gainfully and legally employed at the time he agreed to work on Dow's boat. He has no history of violence or other behaviors that would lead anyone to characterize him as deviant. There is no evidence he was in a leadership or organizer's role in the instant offense as the government's own investigation labelled Dow and Van der End in those roles. Further, Suarez was only asked to work on Dow's boat as the cook after Dow rejected the

conspirator's first choice.

The nature of the crime and Suarez's history and characteristics hardly combine to warrant a punishment of 24.5 years in a foreign prison.

Next, lets compare Suarez's crime to those of other criminal defendants within the Southern District who not only were granted §3582(c)(1)(A) relief, but were given immediate release. First, in United States v. Rodriguez, supra., defendant Rodriguez was granted immediate compassionate release despite his criminal history, his character, and the nature of his offense: He received a life sentence after participating in a murder, yet the Southern District of New York determined, "... the pandemic ... has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case." The pandemic trumped murder.

Then there is United States v. Reiter, supra., where the defendant was convicted for RICO violations, possessing and distributing heroin, and three drug-related murders. His personal history and character make Rodriguez appear to be an angel, and he was sentenced to two life sentences plus another 60-years once those life sentences ended. Again, the Southern District of New York found the pandemic created conditions of incarceration more harsh than Reiter's life sentence foretold and released him on compassionate release.

The point here is twofold: First, in comparing Suarez to other criminal defendants, one cannot claim his instant offense is too egregious to be given a reduction of sentence. Suarez, a first-time, non-violent offender pled guilty of possessing cocaine with intent to distribute. He was traveling in international waters with no proven direct-nexus between his actions and the United States. To claim he cannot satisfy §3553(a)(1) cannot be rational. Second, our justice system is based upon the foundational concepts of jurisprudence, or binding case law. For this court to claim Suarez's crime or character disqualifies him from a reduction of sentence when this district has granted immediate release to murderers serving life would undermine that foundational concept.

When returned to Curacoa, Suarez will be the primary caregiver for his 85-year old father who currently needs help with basic life-functions after the passing of Suarez's mother. His character and history suggest Suarez will be a loving, attentive son as he was throughout the course of his life.

12

B. §3553(a)(2)(A), (B), (D), and §3553(a)(4): To Reflect the
Seriousness of the Offense to Promote Respect for the
Law, to Provide Just Punishment for the Offense; to
Afford Adequate Deterrence to Criminal Conduct; to
Provide the Defendant with Needed Educational or
Vocational Training ... and to Consider the Kinds of
Sentence and Sentencing Range

The Government initially offered a plea agreement of 60-months
incarceration for Suarez's guilty plea. Suarez rejected that
offer because his lawyer did not explain the sentence disparity
that would result from losing at trial. Suarez also did not
believe he was guilty as charged. After numerous enhancements,
the government recommended a sentence guideline range of 292-365
months imprisonment. One purpose of §3553(a) is to ensure
criminal sentences are not greater or more severe than necessary.
The discrepancy between 60-months and the 292-months this Court
sentenced Suarez to serve cannot be easily explained. Suarez's
alleged crime had not changed; his involvement remained the same.
Prior to his eventual plea, the government believed a 5-year
sentence fulfilled the requirements of §3553(a). Logically, if
five-years in prison is a punishment that equals the crime, 24.5
years in prison for the same crime must represent a sentence
greater than necessary. There cannot be two standards, or two
versions of §3553(a): One that requires a five-year sentence one
month, and a 24.5 year sentence several months later. Nor does
Suarez's 292-months in a foreign prison correspond to the
overwhelming number of similar cases decided by the Southern
District of New York between 2016-2017, the year Suarez was
sentenced. Simply, Suarez's original sentence created the type of
sentence disparity §3553(a) was put in place to prevent.

Subsequently, a reduction in sentence under §3582(c)(1)(A) cannot
violate the factors outlined in §3553(A)(2)(A) and (B). Reducing
Suarez's sentence would, in actuality, properly restore the
spirit of §3553(a). Suarez has maintained prison employment when
able, and participated in prison-sponsored programming. He was
locked in his housing unit or on modified operations for 30-
months and forced to work next to COVID-positive staff for 15-
hour days on the prison's East side. He was assaulted by another
inmate, placed in disciplinary housing, and recontracted COVID
there. Now he potentially has ▌  ▌       ▌   ▌     and
qualifies for the retroactive application of the amended
sentencing guidelines.

13

C. §3553(a)(2)(C): To Protect the Public From further Crimes
of the Defendant

The American public will be protected from any "future crimes"
committed by Suarez because, upon release, he will be deported to
the Netherlands or Curacao. In deciding other §3582(c)(1)(A)
requests, the Southern district has determined deportation is a
consideration in favor of granting a reduction of sentence. See
United States v. Francis, No. 06-cr-0080 LEXIS 13272 (SD NY
2021), stating, "The Court is likewise satisfied that defendant
will not pose a danger to any persons or to the community
[because the] defendant is subject to an ICE detainer." See also
United States v. Hernandez-Frometa, No. 18-cr-0660 LEXIS 193073
(SD NY 2020).

It is unlikely, given Suarez's experience within the United
States' legal system, that he would try to re-enter this country.
See United States v. Ledezma-Rodriguez, 472 F.Supp.3d 498 (SD IA
2020) where the government/ICE can fast track transfer back to
one's home country.

D. §3553(a)(6): To Prevent Unwarranted Sentence Disparities

As shown herein, a reduction in Suarez's sentence would actually
rectify an unwarranted sentence disparity of 24.5 years in
prison. Combined with the disparity that now exists due to
expansion of 46 U.S.C. §70503 under §3553(f), a sentence
reduction would rectify an existing injustice, not create one.

Furthermore, Suarez's indicted co-defendant, Richard Dow, the
mastermind of the enterprise, who had a history of drug
trafficking, who owned the boat, who organized the venture, and
who hired Suarez, received a 29-month sentence because he told US
authorities what they already knew and had determined as part of
their investigation. The organizer and leader, Dow, testified to
whatever the government requested of him to secure a two-year
five-month sentence (minus his time-served awaiting sentencing)
to avoid a 24.5 year sentence. How can it be justice for Dow to
serve 22 less years in prison simply because he testified at a
Fatico hearing? The leader of the crime does 22 less years than
Suarez, the very last person added to the conspiracy at the very
last minute who had never previously met Dow and had never
previously committed a crime. That is an injustice in violation
of the §3553(a).

Due to changes of law, Suarez, were he to be sentenced today,
could benefit from the Safety Valve reduction under §3553(f).
Such a change creates a sentence disparity that this Court, post-
Concepcion, may remedy. Having shown that no statements or
actions violated the five requirements enumerated within
§3553(f), Suarez asks this Court to recognize an unwarranted
sentence disparity.

## VI. CONCLUSION

Petitioner asserts he qualifies for a reduction of sentence under §3582(c)(2). He meets all of the criteria under the new USSG §4C1.1. All of the sentencing factors militate in favor of this reduction. He is precisely the kind of inmate the US Sentencing Commission now recognizes no longer requires a lengthy sentence as once believed. Granting this request would be an appropriate use of judicial discretion. However, Petitioner also exemplifies at-risk inmates amended guideline 1B1.13 is meant to help.

Petitioner also qualifies for compassionate release under the USSG §1B1.13(b)(1)(C) pursuant to §3582(c)(1)(A) due to FCI Fort Dix's inadequate medical care. He has demonstrated the relevant sentencing factors enumerated in 18 U.S.C. §3553(a) have been met to allow compassionate release.

WHEREFORE all of the above reasons, Petitioner requests this Court grant his request for compassionate release, or, in the alternative, a reduction in sentence to 120-months as recommended by Petitioner's PSR.

Respectfully submitted,

Gerson P. Suarez

15

Gerson Scanes 75873-052
Federal Correctional Institute
PO Box 2000
Joint Base MDL, NJ
08640

US District Court
Office of the Clerk
500 Pearl St.
Room 120
New York, NY
10007-1312

USM3 SDNY

RECEIVED
MAY 08 2024
C.I.R.
SDNY